UNITED STATES of America, Plaintiff,

v.

The AMERICAN SOCIETY OF ANES-THESIOLOGISTS, INC., Defendant.

No. 75 Civ. 4640 (KTD).

United States District Court,
S. D. New York.

June 21, 1979.

Ralph T. Giordano, Atty., Dept. of Justice, New York City, for plaintiff; John Sirignano, Jr., Douglas C. Foerster, Edwin Weiss, Daniel J. Pearlman, New York City, of counsel.

Simpson, Thacher & Bartlett, Washington, D. C., for defendant American Society of Anesthesiologists, Inc.; John Lansdale, Jr., Rickard F. Pfizenmayer, Timothy W. Bergin of Squire, Sanders & Dempsey, Washington, D. C., of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This is an action brought by the United States of America against the American Society of Anesthesiologists [hereinafter referred to as "ASA"] charging that organization with violating Sections 1 and 4 of the

Sherman Act, 15 U.S.C. §§ 1 and 4. The government alleges that the ASA combined and conspired with its component societies, individual anesthesiologists and others to engage in a restraint of interstate commerce. This conspiracy allegedly consisted of an agreement to raise, fix, stabilize and maintain fees charged by anesthesiologists for anesthesia services. The government contends that the adoption, publication and circulation of relative value guides is a *per se* violation of the antitrust laws and as such should be enjoined. The ASA denies that it engaged in any conspiracy and maintains that the drafting, adoption and publication of relative value guides constitutes a proper and reasonable service to its members, government agencies and health insurance carriers.

## BACKGROUND

The ASA is a tax exempt membership corporation organized and existing under the laws of the State of New York with its only office in Park Ridge, Illinois. Most of its members are physicians engaged in the practice of anesthesiology, however, there are some non-physician members.

In 1975 ASA membership included:

(a) 9,463 "active members," who are licensed physicians or physicians on active duty in the Armed Forces engaged in the practice of, or otherwise especially interested in, the medical specialty of anesthesiology;

(b) 300 "affiliate members," who are physicians not engaged in the clinical practice of anesthesiology; scientists, not physicians, who are in the service of the United States Government; and physicians who are non-residents of the United States;

(c) 2,388 "resident members," who are physicians in full-time training as interns or residents in anesthesiology;

(d) 1,300 members in other categories including "honorary members," who have attained outstanding eminence in anesthesiology; "life members," who are Past-Presidents of ASA; and "retired members," who are physicians who have been active members for ten or more years and have retired from professional activity.

ASA component societies are organizations of anesthesiologists, chartered by ASA, but independent in the sense that they determine their own policies unless such policies are specifically required by ASA By-Laws. ASA has active component societies in 48 states, the District of Columbia and the Commonwealth of Puerto Rico. Some of these component societies are themselves subdivided based upon geographic area. For example, The New York State Society of Anesthesiologists is comprised of eight "District Societies."

Active members and certain affiliate members become such by joining component societies. A substantial number of ASA members, however, are not members of component societies.

Under its By-Laws, ASA is governed and its policies are determined by a House of Delegates, most of whom are elected by the voting members or the legislative bodies of the component societies. ASA's business affairs are controlled (subject to override by the House of Delegates) by a Board of Directors whose members are elected by ASA's active and life members in 28 "Director Districts", 11 of which are geographically co-extensive with the component societies. The House of Delegates meets annually and, among other items of business, elects officers, including a President, President-Elect, and First Vice President. A Secretary and a Treasurer are elected by the House of Delegates for two-year terms beginning in odd numbered years.

Anesthesiology is a medical specialty which deals with the management of procedures for rendering a patient insensible to pain during surgical, obstetrical and certain other medical procedures; the support of like functions under the stress of anesthetic and surgical manipulation; the clinical management of the patient unconscious from whatever cause; the management of problems in cardiac and respiratory resuscitation; the application of specific methods

of inhalation therapy; and the clinical management of various fluid, electrolyte and metabolic disturbances. The specialty had a somewhat stop and start development; although important anesthetic drugs were discovered in the nineteenth century, the techniques and arts of anesthesia did not advance until approximately 1928. As a result of this failure to develop new anesthetic drugs and techniques, surgical procedures were also limited. Prior to 1928 the administration of anesthesia was regarded as a relatively simple procedure that did not necessarily require the expertise of a medical doctor. For the most part, nurses and technicians were utilized to administer anesthetic drugs.

Development advanced significantly in 1928 when Dr. Ralph Waters established the first department of anesthesia at the University of Wisconsin. Other medical establishments followed suit and in 1939 the American Board of Anesthesiology was created to test and certify the competence of physicians in this newly-developed specialty. It was World War II, however, that provided the impetus for the widespread development of the specialty. The government required that physicians be utilized to administer anesthesia wherever possible and, accordingly, young doctors were given crash courses in the area. As a result of this experience, surgeons began to recognize the value of physician-administered anesthesia and demand their expertise when they returned to civilian life. In addition, many of the young physicians who practiced anesthesia during the war decided to pursue that specialty. This new interest spurred efforts to establish additional residency training programs and to recruit more doctors into the field.

When the specialty was still young, it was common for anesthesiologists to work as salaried employees of the hospitals in which they practiced their profession. Anesthesia was considered part of the hospital's services and was billed to the patients as such. Anesthesiologists were dissatisfied with this manner of practice because it impaired their status in the medical community and their recognition by the community at large. Additionally, the level of compensation was below that of other specialists, a factor which contributed to discouraging new entrants into the field.

By 1957 the salaried anesthesiologist had become the exception. Anesthesiologists began to establish independent practices and were able to obtain hospital privileges upon the same terms and conditions as other clinicians. Today, between 80 and 90% of those ASA members who are actively engaged in the practice of anesthesiology derive income from fees paid by or on behalf of individual patients. Although there are no authoritative figures on the income of anesthesiologists, it has been estimated that ASA members realize annual revenues in excess of $675 million. To place this sum in perspective it should be noted that available figures indicate that in 1975 there were approximately 13,370 physicians in the United States engaged in anesthesiology and nearly all were ASA members.

The principal activity of most anesthesiologists who are in the clinical practice of medicine is in connection with the performance of surgery in a hospital. Ordinarily, the patient about to undergo surgery does not choose his anesthesiologist. That decision is usually made by the surgeon or assigned to the patient's case by the operating room supervisor or head of the anesthesiology department. It is not uncommon for a patient to have his first contact with the anesthesiologist just prior to being brought into the operating room for surgery.

It is perhaps a result of this minimal contact that the anesthesiologist and his patient rarely discuss fees prior to surgery. Even where there is a significant presurgical meeting, however, it appears that patients seldom inquire regarding fees. Indeed, the patient usually learns the amount of the fee when the bill is rendered.

It is common practice for a group of anesthesiologists, organized as a single business entity, to carry on all of the anesthesia practice in a single hospital. This does not necessarily mean that a non-group member

could not practice in that hospital if a request were made. There are also some hospitals where more than one group practices in the same hospital or where individual anesthesiologists practice in the same hospital. Even where group practices exist, it is not uncommon for fees to vary among members of the group.

## INTERSTATE COMMERCE

For the most part, anesthesia fees are covered by health insurance. Health insurance carriers sell insurance policies to individuals or groups of individuals. These policies, in consideration of premiums paid by or on behalf of the insured, cover the expense of health services either by way of reimbursement of payments made by the insured, or by direct payment to the provider of the health service, depending on the terms of the policy. Companies engaged in the business of selling health insurance policies regularly receive premium payments made across state lines and make payments to providers of health services, to the holders of policies and to others across state lines in a regular flow of interstate commerce. Where health insurance policies do not cover the entire cost of the anesthesiologist's services, the patient may be responsible for the payment of the difference between the amount billed by the anesthesiologist and the amount paid by the insurer. In fiscal 1974, private health insurance carriers made payments of approximately $7,081,000,000 for physicians' services.

Public health insurance is also provided to certain persons pursuant to the "Health Insurance for the Aged [Act]," 42 U.S.C. § 1395 et seq., commonly known as the "Medicare" Program. Some 24 million people pay monthly premiums to the Bureau of Health Insurance of the Social Security Administration of the Department of Health, Education and Welfare. Such premiums, together with additional Federal funds, are used to pay charges for health services provided to those covered by the Medicare Program and for the costs of administering the program. Medicare generally covers 80 percent of expenditures in excess of $60 per calendar year for physician's services. In 1975, Medicare benefits in excess of $11,322,000,000 were paid on behalf of nearly 13 million people. Local health insurance carriers, sometimes referred to as "intermediaries" service the Medicare program as agents for the United States Government pursuant to regulations and instructions issued through and administered by the Bureau of Health Insurance.

Medicaid, formerly known as the "Grants to States for Medical Assistance," 42 U.S.C. § 1396 et seq., is another government reimbursement program. It is jointly financed by the Federal, State and local governments and administered by State governments in accordance with Federal law. The program is voluntary with each individual state and every state but Arizona has Medicaid programs. Medicaid pays for medical expenses, including reasonable physicians' fees, of needy and low-income people who are aged, blind, disabled, under 21, or members of families with dependent children. In fiscal 1974, Medicaid payments totalled $11,218,000,000 of which the Federal government paid $5,824,000,000. In 1975, Medicaid paid medical charges for more than 22 million people.

Anesthesiologists, including those who are members of ASA, are among the physicians whose fees are covered by the Medicare and Medicaid Programs. Medicare reimbursements involve substantial payments to anesthesiologists made by the United States Treasury across state lines, through insurance carriers acting as intermediaries. Pursuant to the Medicaid program, substantial payments are also made to anesthesiologists located throughout the United States by state governments from funds received across state lines, from the U.S. Treasury.

In addition to the reimbursements outlined herein, various state programs cover the cost of medical services to the individual. These programs include Workmen's Compensation and Crippled Children's Programs.

As noted above, a substantial portion of the fees charged to patients by anesthesiologists, including ASA members, is covered

in whole or part by health insurance carriers pursuant to health insurance policies paid for by or on behalf of such patients or by some governmental health program. Fees charged by members of ASA for their services to patients have an effect upon the cost (and consequently the premiums) of such health insurance and such governmental programs.[1]

## RELATIVE VALUE GUIDES

I indicated at the outset of this opinion that the crux of this case involves the adoption, publication and circulation of the ASA relative value guides. A relative value guide [hereinafter referred to as "RVG"] is a list of medical procedures which are individually described in medical terminology and by reference to an abstract number known as a "unit value." RVGs first came into use in the medical profession in 1956 when the California Medical Association adopted and published the California Relative Value Study based upon a statistical study of physicians' actual charges in California. Included in the California Relative Value study was the assignment of a value expressed in "units" for each procedure within four separate classifications, i. e. medicine, surgery, radiology and pathology. The purpose of the study was to determine the relationship or relative value of one procedure to another and offer a pattern or formula for everyone who buys, sells or administers health insurance. Individual physicians desiring to correlate their own fees to the relative fees charged by a majority of California physicians could do so by dividing the unit value set out into his usual fee for a specific procedure and thereby derive a conversion factor. That conversion factor could then be used as a multiplier for all other procedures to arrive at the fee. For example, assuming the doctor's usual fee for a procedure frequently done by him is $25 and the Relative Value Study assigned 5 units for that procedure, the conversion factor is $5. A procedure with a unit value of 7 would thus be billed at $35.

In years subsequent to the issuance of the California Relative Value Study, many state medical societies and speciality societies issued their own relative value guides. Such guides may be used by individual physicians, health insurance carriers, government agencies and others to construct a schedule of fees which will be charged or charges which will be paid, for physicians services. A fee schedule, which sets forth comparative values of medical procedures expressed in dollars, can be constructed from an RVG by multiplying the unit value assigned to each medical procedure which is to be included in the fee schedule by a conversion factor.

In October 1961, the ASA House of Delegates, whose membership includes representatives from all ASA component societies, passed a resolution that ASA develop an RVG for anesthesiology services. The events leading up to this resolution merit recitation.

In the initial years of the establishment of anesthesiology in private practice, fees were often fixed by anesthesiologists as a percent of the surgeon's fee. As services provided by anesthesiologists expanded and changed, and as it became evident that the anesthetic problem and the skill and medical judgment required bore no necessary relationship to the surgical procedure and its difficulty, other methods of arriving at anesthesiologists' fees were adopted, including consideration of the time required and the age and general health of the patient. In the mid-1950's, however, Blue Shield fee allowances were primarily based on a percentage of surgical fees or on a pure-time basis.

In 1956 the Federal government established a program for the provision of medical services to dependents of military personnel known as "Champus." Payment for physician's services was effected in accordance with fee schedules established in each state as a result of negotiations with the

---

1. Anesthesiologists utilize drugs and equipment that are shipped in a continuous and uninterrupted flow between and among the United States. Plaintiff also relies on this connection with interstate commerce as a basis for jurisdiction.

organized medical profession. The policy of the Government was to negotiate with State medical societies and not individual specialty societies. As a result of the negotiations, Champus followed the format of Blue Shield and paid a percentage of the surgeon's fee or on time basis.

It appears that many anesthesiologists were dissatisfied with the reimbursement schedules adopted by Champus and Blue Shield. They thus set about the task of persuading these and other third party carriers to change their formula for arriving at allowances for anesthesiology service. To further this goal the ASA assigned to one of its committees the task of developing a rational basis for arriving at anesthesia fees. As a consequence of recommendations received from this committee and its general membership, the ASA House of Delegates in October 1961, passed the resolution referred to above. On June 25, 1962 a draft of the first ASA RVG was approved for submission to the House of Delegates.

Copies of the draft ASA RVG were sent to each member of the ASA House of Delegates so that each delegate would be in a position to review the draft and to discuss its contents with the various delegate's constituents prior to the annual meeting of the House of Delegates scheduled for October 1962. Upon being introduced to the House of Delegates on October 22, 1962, the draft of the ASA RVG was sent to a reference committee for hearings and action. Following the hearings, editorial changes and some changes in unit values were made. The reference committee then recommended that the amended draft be accepted by the House of Delegates.

On October 25, 1962, ASA's House of Delegates approved the 1962 ASA RVG. The vote was almost unanimous—the only opposition recorded was voiced by the Delegates from South Carolina and Mississippi. One free copy was supplied to each component society. Other copies were sold for $2.25 each. Between November 1962 and

August 1967, 3,800 copies of the 1962 RVG were published, substantially all of which were sold by ASA.

The 1962 ASA RVG is a document of 103 pages, setting forth instructions for its use and listing unit values for some 1,450 surgical procedures. An example of the entries are the following:

| Procedure | Anesthesia Value |
|---|---|
| Incision and drainage of infected or non-infected cysts (up to 5) | 3.0 + T |
| Appendectomy | 5.0 + T |
| Excision and graft, thoracic aorta | 25.0 + T |

"T" which refers to time and anesthesia values which under the 1962 ASA RVG were to include time at one additional unit for each "fifteen minutes or major fraction thereof" of "anesthesia time." A footnote to the text describes the calculation of anesthesia time:

Anesthesia time starts with the beginning of the administration of the anesthetic agents and ends when the anesthetist is no longer in personal attendance (when the patient may be safely placed under customary post-operative supervision).[2]

The ASA RVG was designed to provide assistance to local component societies of the ASA or individual anesthesiologists who participate in the development of local fees schedules. There is no suggestion as to the monetary value of any point on the scale, and, indeed, the ASA declined all invitations to suggest any appropriate conversion factors.

In October 1967, the ASA adopted a revised RVG. Between November 1967 and May 1970, some 9,000 copies of the "Relative Value Guide—1967" were printed and substantially all of such copies were sold by the ASA. The 1967 RVG featured a number of changes from the 1962 RVG which included:

---

**2.** Plaintiff's Exhibit 3 at III. Hereinafter plaintiff's exhibits will be referred to as "Px." Defendant's exhibits will be referred to as "Dx" and transcript references will be indicated by "Tr."

(a) An additional section in which unit values were assigned for special procedures not related to surgery—*e. g.,* hypnosis, electric shock treatment.

(b) The adoption of "Modifying Units." These were units added to the usual unit value of a particular procedure based on physical status of the patient, the type of operation—elective or emergency, and the age of the patient—under 1 year or over 70, were each the basis of additional modifying units.

(c) The computation of time on the basis of fifteen minute intervals or any fraction thereof (as compared with the "major fraction thereof" designated in the 1962 RVG). Computation was to begin when the anesthesiologist first came into attendance with the patient for the purpose of creating the anesthetic state and to end when he was no longer in personal attendance; and

(d) Changes in the unit value of a number of procedures.[3]

The addition of modifying units for operations involving the elderly or extremely young patient was part of an effort to improve allowances and truly reflect the skill involved in more difficult anesthetic procedures.[4] The passage of the Medicare Act in 1965 apparently had an impact on the number of elderly people seeking surgery and thus age as a modifying factor became a consideration in the 1967 guide.

Emergency procedures were also accorded additional modifying units reflecting the difficulty of the procedure. Assuming that a conversion factor would stay constant or rise, these additional units would have the effect of increasing the fees charged for the service.

Time unit charges in the 1967 guide also had a potential for increasing fees. Whereas the 1962 ASA RVG had designated one time unit to be added to the "basic value" for "each fifteen minutes or major part thereof,"[5] the 1967 ASA RVG added one unit for "each 15 minutes or fraction"

thereof. Thus, while a procedure lasting 31 minutes would be assigned two units under the 1962 RVG, under the 1967 RVG it would be assigned three units. Another time change between the two guides involved the calculation of when anesthesia time started. In the 1962 guide it started "with the beginning of the administration of the anesthetic agents" whereas under the 1967 guide anesthesia time began when "the anesthesiologist is first in attendance with the patient for the purpose of creating the anesthetic state."

A third RVG was adopted by the ASA House of Delegates in October 1970. The first edition was found to have a number of typographical errors and a corrected edition was published in June 1971. Substantially all of the 7,620 copies of this corrected edition were sold between 1971 and 1973 when a fourth RVG was adopted. 7,330 copies of the fourth RVG were published and substantially all were sold. A fifth RVG, the "1974" edition, was adopted in October 1974, 3,200 copies of the 1974 RVG were published between 1975 and 1976, substantially all of which were sold. The 1975 RVG was adopted in October 1975. 8,000 copies were published and again most were sold.

The RVGs thus far described were all adopted by a procedure substantially similar to that utilized in the adoption of the 1962 RVG. Between 85 and 90 percent of the ASA RVGs printed were sold to individual physicians most of whom were ASA members. Between 10 and 15 percent of the RVGs were sold to health insurance carriers, agencies of the Federal, State and local governments concerned with the payment of charges for medical services, educational institutions and others.

The ASA encouraged component societies to develop their own relative value guides but only five states took this action. On the other hand, eighteen component societies took formal action adopting or recommending the use of the ASA RVG to their

---

3. Px 4.

4. Tr. 303–04.

5. Px 3—p. III.

members. From 1962 to the present it has been the practice of each component society to inform its membership of action taken at ASA House of Delegates' meetings, including any action relating to the adoption or revision of the ASA RVGs and the availability of copies thereof to any member.

No component society has ever taken any formal action to dissuade its members from using the ASA RVG. On the other hand, the ASA has never employed formal or informal sanctions to discourage individual anesthesiologists from independently determining their own fees on such basis as they should choose. It does appear that at one time or another nearly all ASA's members have used a relative value guide in connection with charging patients and that nearly all anesthesiologists now bill patients on the basis of both time and procedure. The evidence also shows that conversion factors often vary from physician to physician and the ASA has never employed formal or informal sanctions to encourage the use of uniform conversion factors, although there are a number of instances where local societies have reached agreements on a particular conversion factor.[6] Even in these cases, however, there has been no showing of any agreement to conform to these conversion factors, and in fact, it appears that the consensus on conversion factors were reached in contemplation of negotiations with third party payers.[7]

The ASA RVGs were intended to and did play an important role in negotiations with third party carriers.[8] It appears that some component societies encouraged the use of the ASA RVG or a local modification thereof in order that third party payers would have a greater incentive to do the same.[9] Although the ASA itself did not enter into contracts with third party payers, ASA members did offer commentary on particular contracts between individual anesthesi-

ologists and third party payers and what they believed to be reasonable conversion factors.[10]

Despite all these efforts many third party payers did not use the ASA or a component society's RVG as a basis for what constituted a "reasonable" fee. Although some of those who did use one of these RVGs may have done so as an accommodation to anesthesiologists who used the guides in computing fees for their services,[11] it also appears that the relative value guides were considered an appropriate way in which to compute reimbursement.[12]

## DISCUSSION

The Government argues that in or about October 1961, the ASA, its component societies and its members entered into a combination and conspiracy to fix, stabilize and maintain fees charged by ASA members and that this conspiracy was a *per se* unreasonable restraint on interstate trade and commerce in violation of Section 1 of the Sherman Act. Section 1 of the Sherman Act provides that

> every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is [hereby] declared to be illegal . . . . .

15 U.S.C. § 1. Price-fixing by those controlling a trade or business in interstate commerce constitutes one such agreement which is prohibited by the Sherman Act. *United States v. Trenton Potteries,* 273 U.S. 392, 398, 47 S.Ct. 377, 71 L.Ed. 700 (1926).

The Sherman Act was born of the belief that competition will protect the public from the evils of monopoly and price control. *Id.* at 397, 47 S.Ct. 377. The act of competitors tampering with the price structure of a trade or business offends the spirit of competition that underlies the Act.

---

**6.** See Px 23–25; 39–44; 47–53.

**7.** Tr. 154; 257–58; 306–07.

**8.** Tr. 213–15; 290; Px 14; 17–19.

**9.** *See generally* Px 12; 13, 18, 19.

**10.** Tr. 172–3.

**11.** Tr. 65, Px 17.

**12.** Dx 106; 134; 142; 143; 153–54; 159; 178; 189; 193.

**156**

Thus, where a price fixing agreement is established, it is irrelevant whether a justification exists for its use. *Northern Pacific Railway v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Such an agreement is a *per se* violation of the Sherman Act and no further inquiry is necessary.

Of course, the Sherman Act only prohibits combinations or conspiracies in restraint of interstate commerce. Thus, my threshold inquiry must be into the interstate effect of the price restraints with which the Government has charged defendant.

■ It cannot be, nor is it, denied that the practice of anesthesiology is an intrastate activity.[13] The administration of anesthesia and the payment of anesthesia fees by the patient are clearly local in nature. However, it is by now beyond dispute that a wholly intrastate activity may be regulated by the Sherman Act if that activity has an effect, actual or threatened, upon interstate commerce. *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1968).

*Rex Hospital, supra,* is the latest Supreme Court decision to pass upon the required nexus with interstate commerce. In that case, petitioner was a corporation that operated a small hospital in Raleigh, North Carolina. It was claimed that the trustees of Rex Hospital conspired with others to block a planned relocation and expansion of petitioner's hospital. The court found that a substantial effect on interstate commerce had been alleged and reversed a dismissal by the lower court. "As long as the restraint in question 'substantially and adversely effects interstate commerce' . . the interstate commerce nexus required for the Sherman Act coverage is established." *Id.* quoting *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 234, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

■ The ASA has honed in on this quoted language and argues that because the Government has failed to show that the alleged local restraint had an adverse effect upon interstate commerce, the action must be dismissed. The ASA contends that, in fact, no effect on interstate commerce has been shown whatsoever and that plaintiff's failure to demonstrate that ASA's activities had any effect on anesthesia fees is fatal to its attempt to connect those activities to interstate commerce.

I disagree. It has been established that the ASA RVG was adopted as a guide for defining an appropriate manner in which anesthesiologists might be reimbursed. Apparently the principles set out in the guide were embraced by most anesthesiologists since today it is common for them to bill their patients on a time and procedure basis and nearly all have at one time or another used a relative value scale. It has been stipulated that the cost of anesthesia services has an effect on insurance premiums which are received from holders of insurance policies across state lines. Anesthesiologists themselves receive a substantial portion of their revenue from health insurance carriers which payments are also in the flow of interstate commerce. Additionally, since the Medicaid and Medicare programs make reimbursements based on a consideration of the actual fees charged, the payments made are to a large extent dependent on what anesthesiologists bill their patients. Thus, to the degree that the promulgation of an RVG has had an effect on how anesthesiologists set their fees, that effect is also felt by the Medicaid and Medicare programs. That these programs operate in interstate commerce is beyond dispute.[14]

I must conclude that an effect on interstate commerce has been shown by plaintiff. The thorny question, however, is whether in order to invoke the jurisdiction of this court plaintiff must prove that the

**13.** See Tr. 15.

**14.** See pp. 151–152, *supra.*

challenged activities had an *adverse* effect on interstate commerce. As defendant has observed, *Rex Hospital, supra,* appears to have settled the question by requiring that the alleged restraint "substantially and adversely" affect interstate commerce. *Id.* 425 U.S. at 743, 96 S.Ct. 1848. *See also* 1 J. Von Kalinowski, Antitrust Laws and Trade Regulation, § 5.01[4] at 5–97 n. 133. The court in *Rex Hospital* was concerned only with pleadings. In this connection it was noted that it is unnecessary to allege that the conspiracy in question affects market prices. Rather, it is sufficient if the

> the allegations fairly claim that the alleged conspiracy, to the extent it is successful, will place 'unreasonable *burdens* on the free and uninterrupted flow' of interstate commerce . . . . .

425 U.S. 746, 96 S.Ct. 1853 (emphasis added). At trial, of course, it is necessary that the evidence demonstrate these burdens, *id.* at 747 n. 5, 96 S.Ct. 1848, before plaintiff can prevail.

■ Some confusion may have been engendered by *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In that case, the Supreme Court held that a fee schedule formulated by the Fairfax County Bar Association violated the Sherman Act insofar as it recommended minimum fees for a title examination. Although the fee schedule was in the first instance a local restraint, the Court found that when viewed in a practical economic sense, a title examination was a necessary part of a real estate transaction involving loans guaranteed by Federal funds. The Court concluded that interstate commerce had been sufficiently affected for purposes of the Sherman Act because the volume of commerce (loan monies flowing into Virginia) was substantial and the legal service at issue (title examinations) was inseparable from the interstate aspects of the real estate transactions. The fact that no detrimental effect on interstate commerce was shown was deemed to be inconsequential. "Petitioners clearly proved that the fee schedule fixed fees and thus 'deprive[d] purchasers or consumers of advantages which they derive from free competition.' "

*Id.* at 785, 95 S.Ct. at 2012 (citations omitted). Although it might be argued that *Goldfarb* signaled a relaxation of the standard for finding that an intrastate activity affects commerce, this conclusion is difficult to reconcile with the language of *Rex Hospital* which mentions *Goldfarb* only in passing. 425 U.S. 738, 745 nn. 3 & 4, 96 S.Ct. 1848. However, if viewed in the context of price fixing, a *per se* violation of the Sherman Act, the two cases may be harmonized. Since "the *per se* doctrine establishes the unreasonableness of the restraint" 1 J. Von Kalinowski § 5.01[4] at 5–115, when such a violation has been proven it may be unnecessary to go one step further and demonstrate a detrimental burden on commerce. Of course, the substantial effect must still be established. In this case then, if the Government can establish that a price fixing agreement existed, it is sufficient that that activity had a substantial effect on the flow of interstate commerce and plaintiff need not prove that prices were raised or fixed as result thereof. *See also State of Ohio v. Ohio Medical Indemnity, Inc.,* 1976–2 Trade Cases ¶ 61,128 at 70,114 (S.D.Ohio 1976).

I turn thus to the question of whether a price fixing scheme has been established by the evidence. Plaintiff has maintained throughout this case that defendant's activities constitute a *per se* violation of the Sherman Act and that, accordingly, it need not prove any particular effect on competition nor on fees to prevail. Agreements which are considered illegal *per se* are those

> whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.

*National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). An agreement which "[i]nterfere with the setting of price by free market forces" is such a *per se* violation of the Sherman Act. *United States v. Container Corp.,* 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969).

Plaintiff contends that the adoption, publication and circulation of the 1962 ASA RVG constituted an agreement among competitors to manipulate and tamper with the price structure of anesthesia services. It also seeks to prove an implied agreement among defendant and its co-conspirators to use the guide in pricing anesthesia services.

There can be no dispute that members of the ASA agreed to adopt, publish and disseminate an RVG. However, this does not necessarily mean that they entered into an agreement barred by the Sherman Act. The crucial question is whether there was an agreement that the guide would be used in pricing anesthesia services so as to curtail competition or interfere with the setting of prices by free market forces. *United States v. Container Corp., supra.*

■ In fact a preponderance of the evidence does not support the existence of such an agreement, express or implied. It is true that the ASA RVGs were widely disseminated and that many anesthesiologists employed them in their individual practices. However, there is no evidence that the guides were intended as anything other than a *suggested* methodology for arriving at appropriate fees. Moreover, although there is some evidence that the guides were intended as an aid to individual members in computing their bills,[15] the preponderance of the evidence suggests that the ASA RVG was developed primarily for use in connection with negotiating acceptable fees with third party carriers.[16] Indeed, there is substantial evidence that their party payers actively sought the input of ASA in formulating their own reimbursement plans and, in fact, encouraged the ASA to develop such a formula.[17] This evidence is consistent with defendant's contention that the guides were intended for "determining anesthesia fees for inclusion in insurance contracts." [18]

Furthermore, there is no evidence that the ASA ever asked or even suggested that individual anesthesiologists charge similar fees or adhere to the pricing formula set out in the guides. From the outset, the proponents of the RVG stressed that it was no more than a guide. In my view its widespread use was and is more a testament to a need on the part of anesthesiologists for a cohesive, internally consistent, logical and appropriate method for arriving at their fees than it is evidence of an attempt by the ASA to compel (or even urge) adherence to any pricing formula.

■ This need undoubtedly arose because of the unique problems anesthesiology faced as compared with other medical specialties. In a real sense it was long the stepchild of medicine; its rapid development into a full-blown medical specialty called for an equally rapid development of a rational method for arriving at fees. Once established it is not surprising that the relative value methodology was adopted by so many anesthesiologists. However, this adoption does not, in itself, evidence a conspiracy on the part of the ASA that the relative value guides must or should be so used. *See Goldfarb v. United States, supra* 421 U.S. at 781, 95 S.Ct. at 2010, wherein the Court suggested that a "purely advisory fee schedule issued to provide guidelines" might not be considered price-fixing.

Neither does the development of the relative value guides in the context of a third party payer system amount to pricing fixing. In the first place, it has been shown that insurance carriers actively sought input from anesthesiologists, even to the extent of urging that a uniform pricing system be established. Additionally there is nothing to suggest that these carriers were in any way coerced to accept the relative value guides or any particular conversion factor in determining what reimbursement they would allow. Rather, the relative value guides gave anesthesiologists a logical starting point in negotiations and a freedom to play an active role in determining

**15.** Tr. 100; Px 7–8.

**16.** Tr. 268, 290; Dx 18, 19, 62–64, 70, 78, 82.

**17.** Dx 4–9, 11, 12, 14, 16, 17, 19.

**18.** Dx 18, 19.

their fees in connection with insurance reimbursement.

The Government concedes that no overt efforts were undertaken to enforce use of the relative value guides. It argues, however, that "subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line." *United States v. Board of Realtors*, 339 U.S. 485, 489, 70 S.Ct. 711, 714, 94 L.Ed. 1007 (1949). Other than this, widespread dissemination of the guides and their stated purpose to assist "component societies or individual anesthesiologists who participate in the development of local fee schedules," [19] there is no evidence of any ASA influence to encourage use of the RVG. In my view, these delineated activities are much too subtle to give rise to a logical inference that they were intended to "hold people in line." Compare *United States v. Nationwide Trailer Rental Systems, Inc.*, 156 F.Supp. 800 (D.C.Kan.) *aff'd per curiam*, 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957) where there was no evidence that the "suggested" price lists had any purpose other than to affect prices.

Since there was no agreement to encourage use of the ASA RVG, it can hardly be argued that members of the ASA combined to formulate the RVGs "for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity [or a service] in interstate . . commerce . . . ." *United States v. Socony-Vacuum*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). In any event, the activity claimed to be illegal in this case is not a naked price fixing scheme. The guides themselves are merely the barebones of a pricing schedule. Without monetary conversion factors, the guides do nothing more than describe the relative difficulty of certain anesthesia procedures in relation to other procedures. Since these conversion factors are left to the discretion of the individual physician, even the range of charges cannot be said to be truly fixed.

■ For the foregoing reasons, I cannot conclude that the practice under review is illegal *per se*. My inquiry might end here because of plaintiff's failure to demonstrate that the ASA RVGs adversely affected interstate commerce. See pp. 156–157 *supra*. However, because this is a case of first impression and because it cannot be denied that the relative value guides, although not intended to fix prices, did tend to affect price formation, I believe a more extended review is in order. Indeed, I believe the only proper way to analyze this case is under the "Rule of Reason." *See Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

Under a Rule of Reason analysis

the true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Chicago Board of Trade*, 246 U.S. at 238, 38 S.Ct. at 244. In other words, it is my job as factfinder to weigh all of the circumstances of the case in considering the impact of the challenged activity on competitive conditions. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 690, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1977). *See also* Report of the Attorney General's National Committee to Study the Antitrust Laws 14 (1955).

The market for anesthesia services is unique even when considered in relation to

19. Px 2 p. II.

other medical specialties.[20] Anesthesiologists rarely have contact with patients prior to their surgery and the evidence suggests that fees are almost never discussed. In fact, patients have little input into the selection of their anesthesiologists and third party carriers pay over 90% of anesthesiologists' fees.[21] There is no evidence of competition between anesthesiologists insofar as patients are concerned; in fact, there is unrefuted evidence that the patient is not truly a customer of the anesthesiologist.[22]

■ If there is any economic market in anesthesiology it would appear to involve the interchange between insurance carriers and anesthesiologists. Considering this market, the relative value guides are clearly not price fixing mechanisms. As pointed out earlier, there is no evidence that third party payers were in any way coerced into accepting the guides wholesale; indeed, for the most part, they did not adopt the ASA RVG but rather developed their own formulae. There *is* evidence, however, that the guides facilitated the interchange between insurance carriers and physicians[23] and that, in fact, insurance carriers actively sought out the expertise of anesthesiologists in developing an acceptable means of describing their services.[24]

When viewed in the context of this unusual market, it would seem that defendant's activities tended to promote the interplay of such competitive forces as existed in the area. This conclusion is reinforced by the absence of any evidence that the ASA RVGs actually fixed fees or in any way hampered the free play of market forces. Certainly if the guides are as invidious as

the Government suggests, it would not have been difficult to compile data showing that the guides stabilized or raised fees. However, the only concrete evidence on the subject was offered by defendant and tended to show that relative value guides may save third party payers money[25] and that use of the 1975 ASA RVG as opposed to the 1967 ASA RVG would reduce Medicare Program payments to anesthesiologists.[26]

The Government does place a great deal of reliance on the changes between the 1962 and 1967 relative value guides as evidence that the intent of the ASA was to raise fees. The revisions in the guide added modifying factors for time, age and risky procedures. While it is true that these revisions would tend to raise fees *if* conversions remain constant, it is simply unfair to view these changes in a vacuum. The reality is that the revisions tended to define procedures more accurately and reflect the fact that Medicare and Medicaid insurance programs caused a dramatic increase in the amount of anesthesia services needed. Moreover, there was evidence tending to show that not all physicians who used the ASA RVG changed their billing to take into account modifying factors.[27] This testimony reinforces the conclusion that the relative value guides were just what their name suggests, "guides." Physicians were free to accept or reject them, as they so chose.

I must conclude after a careful review of all the evidence and assessment of the testimony adduced that plaintiff has simply failed to meet its burden of proof. It has demonstrated neither an agreement to adhere to a pricing formula nor any concrete

**20.** Tr. 417–18.

**21.** Tr. 427–30.

**22.** Tr. 420. Plaintiff makes much of the fact that nurse-anesthetists engage in the administration of anesthesia and thus compete with anesthesiologists for patients. While there is a bit of evidence that nurse-anesthetists sometimes engage in a fee for service practice, there is no evidence to support the conclusion that they compete with anesthesiologists.

**23.** Tr. 427–30, 214–15, 294–95.

**24.** Dx 4–9, 11, 12, 16, 17, 47, 49, 51–53, 57–63, 83–85.

**25.** The study in question was done by Robert Nathan Associates. Dx 209, 209a.

**26.** Dx 196, 197. Plaintiff denigrates the relevancy of these studies as well as that of Robert Nathan. Note 24, *supra*. I am struck, however, by the absence of any contradictory study or, indeed, of any evidence that the ASA RVGs stabilized, raised or even lowered fees.

**27.** Tr. 130, 305–06.

anticompetitive effect on the market for anesthesia services by virtue of the use of the ASA RVGs. I find its attempt to rely on a *per se* analysis, without consideration of the unique circumstances surrounding the anesthesiology profession and the adoption of the relative value guides, to be much too narrow an approach to the problem at hand.[28] Moreover, when the evidence is analyzed under the Rule of Reason it is clear that defendant is entitled to judgment in its favor.[29]

---

**28.** In my view the *per se* rule is better applied to factual settings in which the challenged activity is so pernicious to "free market" economics that its cessation would, at least in theory, have a clear and favorable impact on the market. Here even if the RVGs were struck down the public would not benefit but, on the contrary, would be left with a pricing system either based on "hunch" or a percentage of some number not under the control of the provider or the consumer.

**29.** Defendant has raised a number of other defenses to this lawsuit, including a claimed immunity based upon the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, and the *Noerr-Pennington* doctrine. Since I find that the ASA RVGs withstand a Rule of Reason analysis, I need not consider the remaining defenses. I will note, however, that it is unlikely that either the McCarran-Ferguson Act or the *Noerr-Pennington* doctrine would apply to the situation presented at bar.