910 F.2d 139
 59 USLW 2134, 1990-2 Trade Cases 69,152
 ADVANCED HEALTH-CARE SERVICES, INC., Plaintiff-Appellant,
v.
RADFORD COMMUNITY HOSPITAL; Southwest Virginia Health
Enterprises, Inc.; Southwest Virginia Health Services;
Southwest Virginia Pharmacy & Medical Company, d/b/a
Community Pharmacy & Medical Supply, Defendants-Appellees.
ADVANCED HEALTH-CARE SERVICES, INC., Plaintiff-Appellant,
v.
TWIN COUNTY COMMUNITY HOSPITAL, d/b/a Twin County Community
Hospital Durable Medical Equipment Supply;
Medserv Corporation, Defendants-Appellees,
Voluntary Hospitals of America, Inc., Amicus Curiae.
ADVANCED HEALTH-CARE SERVICES, INC., Plaintiff-Appellant,
v.
GILES MEMORIAL HOSPITAL; Medserv Corporation; Health East,
Inc., Defendants-Appellees,
Voluntary Hospitals of America, Inc., Amicus Curiae.
 Nos. 89-2312, 89-2376 and 89-2377.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1989.
Decided Aug. 7, 1990.
 
 1
 James Allen Burt, Burt and Gustino, P.A., Orlando, Fla., (James A. Gustino, Scott A. Satell, Burt and Gustino, P.A., Orlando, Fla., Thomas Lloyd, Roanoke, Va., on brief), for plaintiff-appellant.
 
 
 2
 Heman A. Marshall, III, Woods, Rogers & Hazlegrove, Roanoke, Va., Alexander P. Starr, Reed, Smith, Shaw & McClay, Washington, D.C., (Brian R. Jones, Michael F. Urbanski, Woods, Rogers & Hazlegrove, Roanoke, Va., George R. Clark, Robert J. Aamoth, Reed, Smith, Shaw & McClay, Washington, D.C., Martin A. Donlan, Jr., Karen A. Gould, Crews & Hancock, Richmond, Va., on brief), for defendants-appellees.
 
 
 3
 William G. Kopit, Robert W. McCann, Clark C. Havighurst, Epstein, Becker & Green, P.C., Washington, D.C., C. Scott Sykes, Voluntary Hospitals of America, Inc., Irving, Tex., for amicus curiae.
 
 
 4
 Before HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 RICHARD L. WILLIAMS, District Judge:
 
 5
 Advanced Health-Care Services (AHCS) appeals from the district court's dismissal of three cases it filed against several defendants. In two of these, Docket Nos. 89-2376 and 89-2377, AHCS appeals the district court's order of dismissal, pursuant to Fed.R.Civ.P. 12(b)(6), and its refusal to grant leave to amend the complaint upon AHCS's motion for reconsideration. In the other, Docket No. 89-2312, AHCS appeals the district court's grant of the defendants' 12(b)(6) motion to dismiss. In all three cases, AHCS argues that it has stated actionable claims under federal antitrust law upon which relief could be granted if its allegations were proven. For the reasons discussed below, we reverse the district court's dismissal and denial of leave to file an amended complaint in Docket Nos. 89-2376 and 89-2377, and affirm in part and reverse in part its dismissal of Docket No. 89-2312.[1]
 
 I.
 
 6
 Advanced Health-Care Services (AHCS), the appellant, is a supplier of durable medical equipment (DME).[2] On August 1, 1988, AHCS filed three nearly identical complaints in the United States District Court for the Western District of Virginia. In each complaint, the plaintiff alleges that an acute care hospital located in southwest Virginia is exclusively marketing a competitor's DME products to its patients in return for a financial stake in those DME sales. According to plaintiff, these arrangements have significantly diminished its DME sales in those geographic areas. AHCS asserts that the defendants' conduct supports causes of action for: (1) unreasonable restraint of trade in violation of Sherman Act Sec. 1, 15 U.S.C. Sec. 1; (2) monopolization, attempted monopolization, conspiracy to monopolize, and monopoly leveraging in violation of Sherman Act Sec. 2, 15 U.S.C. Sec. 2; (3) exclusive dealing in violation of Clayton Act Sec. 3, 15 U.S.C. Sec. 14; and (4) tortious interference with business relationships under Virginia common law.
 
 
 7
 In Docket Nos. 89-2376 and 89-2377, AHCS alleges that Twin County Community Hospital (Twin County), which owns a 149-bed facility in Galax, Virginia, and Giles Memorial Hospital (Giles), the owner of a 65-bed short-term facility in Pearisburg, Virginia, entered into exclusive agreements under which Medserv Corporation became the sole provider of discharge services and durable medical equipment for the hospitals.[3] AHCS alleges that the hospitals have a monopoly position in the acute care market and that they serve as a funnel for all of the area's DME business. Although AHCS previously serviced a number of the discharged patients from the defendant hospitals as a result of merit-based recommendations from the hospitals' discharge personnel, the new contractual alliances with Medserv allegedly prohibit it from continuing to do so.
 
 
 8
 In Docket No. 89-2312, the plaintiff alleges that Radford Community Hospital (Radford), which provides acute care hospital services to approximately seventy-five percent of the residents of the greater Radford, Virginia, region, has used its monopoly status in that regional market to direct the purchase of DME exclusively in its favor. In 1985, Southwest Virginia Pharmacy & Medical Supply Co., a wholly owned subsidiary of Southwest Virginia Health Enterprises, Inc., which is a corporate affiliate of Radford, purchased a local drug store which has since become the exclusive supplier of DME and discharge services to Radford.[4] AHCS, which had been renting and selling DME to patients discharged from Radford since 1983, contends that its DME business in the Radford area has diminished to virtually nothing since the corporate affiliates of Radford entered the DME market. AHCS complains that discharge personnel from Radford combined and conspired with its corporate affiliates to influence Radford patients not to deal with AHCS, resulting in the illegal domination of the DME market by Radford and Southwest. Specifically, AHCS claims that these discharge personnel unduly influenced patients to discontinue relations with AHCS, that they steered or referred patients to Southwest solely for the financial gain of Radford, and that they refused to inform patients of their right to choose alternative DME vendors.
 
 
 9
 Pursuant to Fed.R.Civ.P. 12(b)(6), the defendants to all three suits, the appellees here, moved to dismiss the plaintiff's first amended complaints for failure to state any claims upon which relief could be granted. On December 29, 1988, the district court granted these motions. In so doing, the court found that AHCS had failed to allege the predatory or unreasonable conduct required to sustain claims under either Sec. 1 or Sec. 2 of the Sherman Act.[5] The court also found that the plaintiff had failed to allege the existence of exclusionary agreements which is required to state a claim under Clayton Act Sec. 3. The district court dismissed the plaintiff's pendent tortious interference claims for lack of jurisdiction.
 
 
 10
 AHCS took no further action in the district court on the Radford case. In the Twin County and Giles cases, AHCS filed a motion to reconsider the dismissals pursuant to Fed.R.Civ.P. 59(e) and to allow a filing of amended complaints. The district court denied the motions to amend as "futile" and denied the motions to reconsider. The plaintiff now appeals all three cases.
 
 II.
 
 11
 In assessing a dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a court must accept the allegations of the plaintiff's complaint as true.[6] Dismissal is not warranted "unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proven in support of its claim." Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir.1969). In antitrust cases in particular, the Supreme Court has stated that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 747, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). See generally Faulkner Advertising Assoc. v. Nissan Motor Corp., 905 F.2d 769, (4th Cir.1990) (reversing district court's 12(b)(6) dismissal in a Sherman Act tying case). We conclude that this rigorous standard for summary dismissal is met for only some of the instant claims.
 
 A. Sherman Act Sec. 1
 1. The Twin County and Giles Cases
 
 12
 The first count of the appellant's complaint in the Twin County and Giles cases is for unreasonable restraint of trade in violation of Sec. 1 of the Sherman Act. In support of this claim, AHCS alleges that the hospitals have directed their discharge staff to refer all DME business to Medserv and to deny AHCS any access to their patients. Further, AHCS claims that the marketing presentations made by the hospital discharge planners are biased in favor of Medserv in that they do not inform discharged patients about other potential suppliers of DME. AHCS also alleges that, on occasion, the discharge planners have ordered DME from Medserv without first consulting the patients.
 
 
 13
 The hospitals allegedly receive 65% of all revenues generated by Medserv's DME rentals to their discharged patients. Their discharge personnel are paid $40.00 for each patient who orders equipment from Medserv and for each outpatient they convince to switch from AHCS to Medserv. Discharge personnel who fail to switch patients to Medserv are threatened with termination, according to plaintiff.
 
 
 14
 In sum, the plaintiff alleges that the patients being discharged, who are the consumers of DME, are ignorant of the existence of other DME suppliers and are particularly vulnerable to manipulation by hospital personnel. AHCS asserts that these factors completely foreclose the DME business to Medserv's competitors and deny consumers the benefits of competition in the DME market. As a result, AHCS complains that it no longer receives any orders from patients being discharged from the hospitals, that Medserv now has 85% of all patient orders emanating from the hospitals, and that the appellees have succeeded in monopolizing the DME markets in their respective geographic areas.
 
 
 15
 Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. Sec. 1.[7] As the parties agree, in order to prevail on its Sec. 1 claim in these cases, plaintiff must prove that the defendants' concerted action established an unreasonable restraint of trade. See Continental T.V. v. GTE Sylvania, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (concerted action on non-price restrictions is subject to rule of reason analysis, requiring a showing of an adverse effect on competition in the relevant market). In so doing, the plaintiff must show:
 
 
 16
 (1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy.
 
 
 17
 Terry's Floor Fashions v. Burlington Indus., 763 F.2d 604, 610 n. 10 (4th Cir.1985). To establish these elements in these cases, the plaintiff has alleged that the defendants have successfully conspired to exclude all competition in the DME markets in the areas surrounding Twin County and Giles Memorial and that this exclusion is the result not of business acumen, historical accident, or merits competition, but of anti-competitive monopolistic intentions.
 
 
 18
 The district court nonetheless dismissed the plaintiff's Sec. 1 Sherman Act claims because it found the acts alleged by the plaintiff to constitute normal, reasonable competitive activity. At this point, there is no record upon which to base such a finding. A determination of the reasonableness of an agreement under Sec. 1 of the Sherman Act requires a market analysis of the impact the restraining activity has on competition. See NCAA v. Board of Regents of the Univ. of Okla., 468 U.S. 85, 103-04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1294 (4th Cir.) (pro-competitive efficiencies can justify anti-competitive effects of vertical restraints on competition), cert. denied, 484 U.S. 827, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987). At this point, the plaintiff's allegations of adverse effects on competition must be accepted as true, and the defendants' pro-competitive justifications considered unproven. Until some discovery is completed, there is no record upon which to assess the reasonableness of the restraints alleged by the plaintiff, so summary dismissal of the plaintiff's Sec. 1 Sherman Act claims against Twin County and Giles was inappropriate.[8]
 
 2. The Radford Case
 
 19
 As in the two companion cases, the first count in plaintiff's complaint against Radford alleges an unreasonable restraint of trade in violation of Sec. 1 of the Sherman Act.[9] The gravamen of that count is that Radford and its corporate affiliates directed their discharge staff to divert all DME business to Southwest. In support of this claim, the appellant alleges that Radford's discharge personnel limited AHCS's access to Radford patients, exclusively recommended Southwest's products, and failed to inform patients of other available alternative suppliers of DME. As a consequence of defendants' allegedly illegal concerted activity, appellant claims that its business in that area was significantly diminished.
 
 
 20
 The Sherman Act distinguishes between concerted and independent action. The conduct of a single firm is governed by Sec. 2 alone and is unlawful only when it threatens actual monopolization.[10] In contrast, Sec. 1 of the Sherman Act prohibits "unreasonable restraints of trade effected by 'contract, combination ... or conspiracy' between separate entities." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984).
 
 
 21
 The question before this Court is whether concerted action between two subsidiaries of the same parent corporation, or more precisely, between a subsidiary of one subsidiary and another subsidiary of the same parent corporation, can lead to Sherman Sec. 1 liability.[11] In Copperweld, the Supreme Court established that a parent corporation and its wholly owned subsidiary are legally incapable of conspiring with each other under Sec. 1 of the Sherman Act. Id. at 771, 104 S.Ct. at 2741. Thus, any concerted activity between Southwest Virginia Health Services Corporation and Radford or between Southwest Virginia Health Services Corporation and Southwest Virginia Health Enterprises, Inc., would clearly fall outside the reach of Sec. 1 of the Sherman Act.
 
 
 22
 The Supreme Court in Copperweld, however, purposely limited its holding to the specific relationship of parent and wholly owned subsidiary. Id. at 767, 104 S.Ct. at 2739-40. Although the Court was unwilling to expand its holding to encompass other variations in corporate affiliations, it did discourage the resort to a rote application of the intra-enterprise conspiracy doctrine frequently identified with United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), and Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).
 
 
 23
 The Copperweld Court recommended that courts consider whether the affiliated corporate entities have a complete unity of interest rather than focus on mere corporate form. 467 U.S. at 771-72, 104 S.Ct. at 2741-42. Despite its narrow holding, the Court noted that an agreement between two subdivisions of a single corporation was not likely to be anticompetitive and that antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary. Id. at 772, 104 S.Ct. at 2742. The Court found support for this conclusion in its precedent, reasoning that:
 
 
 24
 Sunkist Growers [, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305] provides strong support for the notion that separate incorporation does not necessarily imply a capacity to conspire. The defendants in that case were an agricultural cooperative, its wholly owned subsidiary, and a second cooperative comprising only members of the first. The Court refused to find a Sec. 1 or Sec. 2 conspiracy among them because they were "one 'organization' or 'association' even though they formally organized themselves into three separate legal entities."
 
 
 25
 Id. at 773 n. 21, 104 S.Ct. at 2743 n. 21 (quoting Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 29, 82 S.Ct. 1130, 1135, 8 L.Ed.2d 305 (1962)).
 
 
 26
 Applying the Supreme Court's reasoning, we conclude that two subsidiaries wholly owned by the same parent corporation are legally incapable of conspiring with one another for purposes of Sec. 1 of the Sherman Act. Although this is an issue of first impression for this Court, both the Fifth and Sixth Circuits have reached similar conclusions. See Directory Sales Management Corp. v. Ohio Bell Tel. Co., 833 F.2d 606, 611 (6th Cir.1987) ("Copperweld precludes a finding that two wholly-owned sibling corporations can combine" in violation of Sec. 1); Hood v. Tenneco Texas Life Ins. Co., 739 F.2d 1012, 1015 (5th Cir.1984) (if two siblings cannot conspire with their parent in violation of Sec. 1, they cannot conspire with each other); Century Oil Tool v. Production Specialties, 737 F.2d 1316, 1317 (5th Cir.1984) (finding no relevant difference between a corporation wholly owned by another corporation and two corporations wholly owned by a third corporation); see also Newport Components v. NEC Home Elec., 671 F.Supp. 1525, 1544 (C.D.Cal.1987) (manufacturer and two wholly owned subsidiaries must be viewed as a "single entity" with "complete unity of interest" for purposes of Sec. 1); Gucci v. Gucci Shops, Inc., 651 F.Supp. 194, 197 (S.D.N.Y.1986) (two corporations with identical owners are by definition legally incapable of conspiring with each other).[12] But see In re Ray Dobbins Lincoln-Mercury v. Ford Motor Co., 604 F.Supp. 203, 205 (W.D.Va.1984) (Copperweld does not apply to an allegation of conspiracy between two subsidiaries of the same parent corporation), aff'd on other issues in an unpublished opinion, 813 F.2d 402 (4th Cir.1985).
 
 
 27
 Thus, we affirm the district court's dismissal of AHCS's Sec. 1 Sherman Act claim in the Radford case, but on different grounds than those set forth by the district court.[13] We further find that the district court's inquiry into the reasonableness of the allegedly anticompetitive activity was inappropriate.
 
 B. Sherman Act Sec. 2
 
 28
 1. The Monopolization and Attempted Monopolization Claims
 
 
 29
 The appellant's complaints in all three cases include counts alleging monopolization and attempted monopolization of the relevant regional DME markets in violation of Sec. 2 of the Sherman Act, 15 U.S.C. Sec. 2. The elements of these claims are very similar. To prevail on a monopolization claim, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury. United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966); Catlin v. Washington Energy Co., 791 F.2d 1343, 1347 (9th Cir.1986). To prove attempted monopolization, the plaintiff must prove a specific intent to monopolize a relevant market, predatory or anticompetitive acts, and a dangerous probability of successful monopolization. See, e.g., Catlin, 791 F.2d at 1348.
 
 
 30
 a. Monopolization of a Relevant Market
 
 
 31
 The factual allegations of the plaintiff with respect to the relevant markets and the defendants' market shares must be accepted as true at this point. See Adams v. Bain, 697 F.2d 1213, 1216 (4th Cir.1982). In its complaints, the plaintiff contends that Medserv and Southwest have a dominant share of the DME markets in their respective relevant geographic areas and that this constitutes monopoly power or a dangerous probability of actual monopolization. These allegations could, if proven, support a finding of monopolization or a dangerous probability of monopolization of the relevant DME markets at stake.
 
 
 32
 b. Predatory Conduct
 
 
 33
 In its complaints, the plaintiff alleges that the marketing strategies and kickback schemes described above are exclusionary and predatory acts designed to acquire and maintain a permanent monopoly in the relevant DME markets. The district court rejected this argument and dismissed all three monopolization counts in part because the plaintiff failed to allege any "predatory conduct" on the part of the defendants.
 
 
 34
 In Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), the Supreme Court reiterated the established proposition that a plaintiff must show that the defendant's conduct was "exclusionary," "anticompetitive," or "predatory" to prevail on a Sec. 2 monopolization claim. Id. at 602, 105 S.Ct. at 2857; see also United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir.), cert denied, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). The key to distinguishing legal exclusion from improper, or predatory, exclusion is whether the exclusion was based on superior efficiency. Aspen Skiing, 472 U.S. at 602-03, 105 S.Ct. at 2857-58.[14]
 
 
 35
 In analyzing this issue, it is appropriate to examine the economic effects of the challenged conduct on consumers, competitors, and the alleged violator itself. See id. at 605, 105 S.Ct. at 2858-59; Drinkwine v. Federated Publications, Inc., 780 F.2d 735, 739-40 (9th Cir.1985), cert. denied, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986). For example, if a plaintiff shows that a defendant has harmed consumers and competition by making a short-term sacrifice in order to further its exclusive, anti-competitive objectives, it has shown predation by that defendant. See, e.g., SmithKline, 575 F.2d at 1065 (Eli Lilly violated antitrust laws in tying the sale of an unpatented drug to the sale of two other patented drugs, thereby losing sales of the patented drugs in order to harm a competitor selling the unpatented drug).
 
 
 36
 In finding that the plaintiff had not alleged predation in the cases before us, the district court found that the defendants "have not sacrificed the attractiveness of their hospital services but rather have made a business deal ... that appears to have produced immediate benefits." Joint Appendix at 33. This finding is premature and shows a misunderstanding of the plaintiff's complaints. In essence, the plaintiff is alleging that the hospitals have linked the purchase of DME to the provision of their hospital services. Thus, for example, if the plaintiff can prove that the DME now provided to patients in the relevant areas is inferior in quality and/or more expensive than AHCS's, it will have shown harm to competitors, short-term sacrifices by the hospitals, and adverse effects on merits competition that injure DME consumers, all as a result of the hospitals' entry into the DME markets. From this, a finder of fact may be able to infer that their motives were anti-competitive (i.e., that these were predatory acts stemming from an illegal specific intent to monopolize). Just as Eli Lilly sacrificed some of the monopoly profits it received in one drug market to raise its market share in another, the hospitals have allegedly used their monopoly in the inpatient acute care market to increase their share of the DME market.[15]
 
 
 37
 The appellees argue that the district court was correct in its statement that antitrust law does not impose a duty on them to refer patients to or advertise on behalf of the plaintiff. Again, this reading miscasts the plaintiff's argument. In Aspen Skiing, the Supreme Court upheld a jury finding of Sec. 2 Sherman Act liability when a ski facility operator refused to continue a joint marketing arrangement with a competitor. The Court noted that "even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor" or "to cooperate with its business rivals." Id. 472 U.S. at 600, 105 S.Ct. at 2856. However, the Court found that the monopolist defendant in that case had made an important change in the distribution pattern that had begun in a competitive market and had continued pursuant to consumer demand for several years. The Court then stated:
 
 
 38
 The absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it might not give rise to liability in certain circumstances.
 
 
 39
 472 U.S. at 601, 105 S.Ct. at 2856.
 
 
 40
 If a refusal to deal with an individual competitor can give rise to antitrust liability in an appropriate case, it stands to reason that an agreement to exclude such a competitor could create liability as well.[16] Therefore, the question in this case is not whether the defendants have a duty to advertise on behalf of or refer patients to the plaintiff; rather, it is whether the purposeful exclusion of this competitor from gaining access to the hospital's patients constitutes the type of circumstances that can give rise to antitrust liability. See Oahu Gas Serv. v. Pacific Resources, Inc., 838 F.2d 360, 368 (9th Cir.) (a monopolist in some instances has "affirmative duties" under antitrust laws to aid its competitors), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). Like the plaintiffs in Aspen Skiing, AHCS deserves an opportunity to develop a factual record that "supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." 472 U.S. at 610, 105 S.Ct. at 2861.
 
 
 41
 c. Antitrust Injury
 
 
 42
 The district court also dismissed the plaintiff's monopolization and monopoly leveraging claims for failure to allege a causal antitrust injury. To make this showing, a plaintiff must show a reasonably probable causal link between the antitrust violation and a business loss of the sort the antitrust laws were designed to prevent. See Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111, 107 S.Ct. 484, 489-90, 93 L.Ed.2d 427 (1986); Catlin, 791 F.2d at 1347-49. The plaintiff in these cases has made colorable allegations that it has lost income as a direct result of the defendants' anti-competitive actions and monopolization of the relevant DME markets. This states a causal antitrust injury with sufficient specificity to survive a motion to dismiss on that ground.
 
 
 43
 Thus, AHCS has stated allegations that, although skeletal, could fulfill all of the elements of claims for monopolization and attempted monopolization of the relevant DME markets in all three cases. Therefore, we reverse the district court's dismissals of the monopolization and attempted monopolization claims under Sec. 2 of the Sherman Act.
 
 2. Monopoly Leveraging
 
 44
 The third count of AHCS's proposed amended complaints in the Twin County and Giles cases and the fourth count of its complaint in the Radford case allege claims for monopoly leveraging in violation of Sec. 2 of the Sherman Act. Assuming that monopoly leveraging constitutes a distinct Sec. 2 violation,[17] a plaintiff asserting such a claim would have to prove that the defendant possessed monopoly power, that it used that power to gain an unwarranted competitive advantage in a second distinct market, and that there was causal antitrust injury to the leveraged market. See Berkey Photo, Inc. v. Eastman Kodak, 603 F.2d 263, 276 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); Kerasotes Mich. Theatres v. National Amusements, Inc., 854 F.2d 135, 137 (6th Cir.1988), cert. dismissed, --- U.S. ----, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989); Grason Elec. Co. v. Sacramento Mun. Util. Dist., 571 F.Supp. 1504, 1518-19 (E.D.Cal.1983).
 
 
 45
 The plaintiff here alleges that the hospitals have monopoly power in the market for short-term, acute care hospital services and that they have used that power, with the specific intent of foreclosing competition, to gain an unfair competitive advantage in the relevant DME markets. AHCS further alleges that the acts outlined above constitute exclusionary and predatory conduct that has artificially foreclosed it from a dominant share of those markets. These allegations could, if proven, support a finding of liability for monopoly leveraging under Sec. 2 of the Sherman Act in each of these cases. The district court's dismissals of the plaintiff's monopoly leveraging claims are, therefore, reversed.
 
 3. Conspiracy to Monopolize
 
 46
 AHCS also alleges in all three cases that the defendants conspired to monopolize the relevant DME markets in violation of Sec. 2 of the Sherman Act. In order to state a claim for conspiracy to monopolize, a plaintiff must show concerted action, a specific intent to achieve an unlawful monopoly, and commission of an overt act in furtherance of the conspiracy. See Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council, 857 F.2d 55, 74 (2d Cir.1988). Unlike an attempted monopolization claim, it is not necessary that the committed acts, themselves, be predatory. See Von Kalinowski, 3 Anti-Trust Laws and Trade Regulation, Sec. 9.02 (1985).
 
 
 47
 In the Twin County and Giles cases, AHCS has alleged concerted action (the DME agreements between the hospitals and Medserv), a specific intent to monopolize relevant markets (the DME markets for the geographic areas surrounding the hospitals), and the commission of overt acts in furtherance of that intent (the implementation of the exclusive agreements). Thus, plaintiff has stated colorable claims of illegal conspiracies to monopolize upon which relief might be granted if its allegations were proven.
 
 
 48
 In the Radford case, for the reasons stated in the discussion of Sec. 1 liability, we affirm the district court's dismissal of AHCS's claim that Radford and Southwest conspired to monopolize the DME market in violation of Sec. 2 of the Sherman Act.[18]
 
 4. The Essential Facilities Doctrine
 
 49
 The sixth count of AHCS's proposed amended complaint in the Twin County and Giles cases is for denial of access to an essential facility.[19] For a defendant to be liable under the essential facilities doctrine, a plaintiff must prove the following four elements:
 
 
 50
 (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility to competitors.
 
 
 51
 MCI Communications v. AT & T, 708 F.2d 1081, 1132-33 (7th Cir.) (citing Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). As with monopoly leveraging claims, the central concern in an essential facilities claim is whether market power in one market is being used to create or further a monopoly in another market. Cf. Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 378 (7th Cir.1986) (lack of business justification for refusing to give a competitor access to essential facility, when combined with other evidence, may indicate probable anticompetitive effect), cert. denied, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987).
 
 
 52
 Here, the plaintiff alleges that the defendants' market power over the provision of acute care hospital services is being used to further a monopoly in the retail of DME to discharged patients. AHCS contends that all DME dealers were equally able to market their services to patients, physicians, and discharge personnel before the hospitals entered into exclusive contracts with Medserv. The plaintiff alleges that now the hospitals will not give it access to their patients. This has resulted in AHCS's inability to compete in the DME market and has ultimately given Medserv complete control over the price and quality of DME services in the areas surrounding Twin County and Giles. AHCS argues that access to patients is an essential facility that cannot be duplicated and that the hospitals could feasibly return to their prior practice of providing this facility to AHCS and other DME providers.
 
 
 53
 These allegations on their face address all of the elements of a claim under the essential facilities doctrine established by MCI and the relevant Supreme Court precedent. Nevertheless, the district court found that the essential facilities doctrine does not apply to this case because it found no allegation that the hospitals controlling the alleged essential facility (access to patients) compete with the plaintiff in supplying DME. Joint Appendix at 35 (citing Interface Group v. Massachusetts Port Auth., 816 F.2d 9, 12 (1st Cir.1987) (upholding airport authority refusal to allow plaintiff to ground facilities because not a competitor)).
 
 
 54
 As noted above, AHCS has alleged that Twin County and Giles, who control access to the alleged essential facility, now have a financial stake in the sale of DME by Medserv to their discharged patients. Whether this connection alone is enough to make the hospitals competitors of AHCS and whether access to hospital patients is actually an essential facility to entry into the relevant market are factual issues that cannot be resolved on a motion to dismiss. Compare Fishman v. Estate of Wirtz, 807 F.2d 520, 539-40 (7th Cir.1986) (upholding liability under the essential facilities doctrine where the owner of a stadium in competition with the plaintiff to purchase basketball team refused to lease the stadium to the other bidder), with Ferguson v. Greater Pocatello Chamber of Commerce, 848 F.2d 976, 983 (9th Cir.1988) (no liability under essential facilities doctrine because minidome owner was not a competitor of prospective trade show producer).
 
 
 55
 Therefore, we reverse the district court's refusal to allow amendment of the plaintiff's complaints in the Twin County and Giles cases to add claims for denial of access to an essential facility.
 
 C. Clayton Act Sec. 3
 
 56
 In its first amended complaints filed in all three cases, AHCS includes a count for violation of Sec. 3 of the Clayton Act, 15 U.S.C. Sec. 14.[20] Section 3 of the Clayton Act provides in pertinent part:
 
 
 57
 It shall be unlawful for any person engaged in commerce ... to lease or make a sale or contract for sale of goods ... on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce.
 
 
 58
 15 U.S.C. Sec. 14. The Supreme Court has interpreted this statute to mean that exclusive dealing agreements are not per se illegal, but are prohibited only if performance of the arrangement will foreclose competition in a substantial share of the affected line of commerce. Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 627-28, 5 L.Ed.2d 580 (1961); see also Satellite Television & Assoc. Resources v. Continental Cablevision of Va., 714 F.2d 351, 354 (4th Cir.1983) ("Exclusive dealing contracts which might function to increase interbrand competition have never been held to be a per se violation of the antitrust laws by the Supreme Court."), cert. denied, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984). As with other antitrust causes of action, a claim advanced under Sec. 3 of the Clayton Act must allege injury to competition, not just to one competitor. See Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489, 97 S.Ct. 690, 697-98, 50 L.Ed.2d 701 (1977). Cf. Eastern Publishing & Advertising v. Chesapeake Publishing & Advertising, 831 F.2d 488, 493 (4th Cir.1987) (12(b)(6) dismissal upheld because plaintiff had not alleged injury to more than one competitor).
 
 
 59
 The plaintiff's complaints in all three cases allege exclusive dealing agreements in violation of Sec. 3 as follows:[21]
 
 
 60
 The contracts, combinations and/or conspiracies by and among [the defendants] whereby said parties jointly agreed or otherwise to act in concert to deal with the Hospital company to the exclusion of all other competitors in the durable medical equipment market constitute an exclusive dealing arrangement in violation of Section 3 of the Clayton Act, 15 U.S.C. Sec. 14.
 
 
 61
 The pleadings allege that "the Hospital company," which is Medserv in the Twin County and Giles cases and Southwest in the Radford case, is the "seller" for purposes of this claim. The pleadings, however, are somewhat ambiguous as to who the relevant buyer is in each case, although they seem to indicate that the hospitals are the actual DME purchasers who are restrained from dealing with other DME suppliers.[22] The plaintiff now alleges that the relevant buyer may also be the discharged patients, but that their decisions are actually made by the hospital discharge personnel.[23]
 
 
 62
 The first possibility, that the agreements run between the hospitals and their exclusive DME suppliers, is deficient because of the respective relationships between the DME vendors and the hospitals. In the Radford case, there can be no exclusive sales arrangement as a matter of law. Although Copperweld has not specifically been applied to Sec. 3 Clayton Act claims, extension of the Supreme Court's analysis is appropriate. If there can be no conspiracy or illegal agreement between Radford and Southwest, it follows, likewise, that there cannot be an illegal exclusive dealing arrangement within the corporate enterprise. Cf. New Amsterdam Cheese Corp. v. Kraftco Corp., 363 F.Supp. 135, 140-41 (S.D.N.Y.1973) (defendant corporation and its division are not separate competitors, within meaning of Clayton Act section prohibiting sale of goods on condition that purchaser not use or deal in goods of a competitor).
 
 
 63
 With respect to Twin County and Giles, the existence of exclusive dealing agreements with Medserv appears, at first glance, improbable. While Twin County and Giles do not fall within the Copperweld exception, they apparently have a significant relationship with Medserv. The commonality of interests advanced by these relationships, on the one hand, militates against a finding of illegal exclusive agreements as contemplated by Sec. 3 of the Clayton Act. On the other hand, these relationships may obscure a more sophisticated exclusive dealing arrangement.
 
 
 64
 Under the more prototypical Sec. 3 claim, a seller persuades a buyer by whatever means to buy only from the seller, to the exclusion of all of the seller's competitors. In the instant cases, the buyers allegedly seek to buy only from Medserv. AHCS complains that this arrangement is anticompetitive because of the allegedly monopolistic power that the buyers enjoy and because of the financial benefit they directly reap from Medserv's profits.
 
 
 65
 This Court made clear in McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332 (4th Cir.1959), that the Clayton Act was intended to reach specific conduct which had been held by the courts to be outside the ambit of the Sherman Act and that the "gravamen of a Sec. 3 violation is the forbidden condition, agreement or understanding of exclusivity." Id. at 337-38. "It makes no difference whether this is voluntary or is imposed by coercion, but without such agreement, condition or understanding, there can be no statutory infraction." Id. at 338. In Twin County and Giles, AHCS alleges that the existence of exclusive dealing arrangements between the hospitals and Medserv has substantially lessened competition and enabled Medserv to garner monopoly power in the DME market. Although not fully developed, plaintiff's allegations are sufficient to withstand a motion to dismiss. The district court thus erred in dismissing this claim.
 
 
 66
 The plaintiff's alternate theory, that the hospital discharge personnel are the actual buyers of DME, ultimately fails and, therefore, deserves only brief attention.[24] To the extent the discharge personnel are the employees or agents of the hospitals, the hospitals are then the constructive buyers, and the analysis and conclusion of the preceding paragraph apply. To the extent the discharge personnel are employees of Medserv or the joint venture, the alleged personnel/buyers are involved in an agreement with their employers. By definition, there cannot be an exclusive dealing arrangement between an employer and its employees. Cf. Schwimmer v. Sony Corp., 677 F.2d 946, 953 (2d Cir.) ("collaborative action between a corporation and its employees, or among employees within a corporation, is not regarded as joint action within the meaning of Sec. 1"), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982); University Life Ins. Co. v. Unimarc Ltd., 699 F.2d 846, 852 (7th Cir.1983) (conspiracy between a corporation and its officers not actionable under Sec. 1).
 
 
 67
 In summary, the plaintiff in the case of Radford has not alleged facts that, if proven, could fulfill all of the elements of a valid cause of action under Sec. 3, and the district court's dismissal of those counts is affirmed. In the cases of Giles and Twin County, plaintiff's allegations are sufficient to withstand a motion to dismiss.
 
 III.
 
 68
 Because the district court found that plaintiff's allegations did not establish federal antitrust violations, it dismissed plaintiff's state tort claims for lack of jurisdiction. We find that the appellant alleged facts sufficient to state valid causes of action in all three cases currently before this Court, and therefore reverse the district court's dismissal of its state tort claims and remand them for further proceedings as well.
 
 IV.
 
 69
 Based on the foregoing, in the Radford case, we affirm the district court's dismissal of the appellant's claims under Sec. 1 of the Sherman Act and Sec. 3 of the Clayton Act and its conspiracy to monopolize claim under Sec. 2 of the Sherman Act, but on different grounds than those stated by the district court. We reverse the lower court's dismissal of appellant's other Sec. 2 Sherman Act claims in Radford. We also reverse its dismissal of appellant's claims under Secs. 1 and 2 of the Sherman Act and Sec. 3 of the Clayton Act in the Twin County and Giles cases. Dismissal of the state law tort claims in all three cases is also reversed. These cases are hereby remanded for further proceedings consistent with this opinion.
 
 
 70
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 K.K. HALL, Circuit Judge, concurring:
 
 71
 While I join in the majority opinion, I believe its lengthy and scholarly discussion of the elements of these various antitrust claims, and AHCS's corresponding factual allegations, may have the unintended effect of obscuring the underlying bases for our decision. Consequently, I write separately to emphasize the two points that are the essence of our holding. First, as the majority opinion persuasively demonstrates, two subsidiary corporations of the same parent corporation, as a general rule, cannot conspire to unreasonably restrain trade in violation of Sec. 1 of the Sherman Act, or enter into an exclusive dealing arrangement violative of Sec. 3 of the Clayton Act. The antitrust laws must recognize business reality and treat these corporations as a single economic entity.
 
 
 72
 Second, as to the rest of AHCS's claims, although they are tenuous at best, and most likely meritless, they are sufficient to survive a motion to dismiss. As the majority opinion states, dismissal is not proper "merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff colorably states facts which, if proven, would entitle him to relief, the motion to dismiss should not be granted." Op. p. 145, n. 8, quoting Adams v. Bain, 697 F.2d 1213, 1216 (4th Cir.1982). Simply put, a plaintiff must be given a chance to prove his colorable factual allegations, even if it appears unlikely that he can do so. Here, the district court slighted AHCS of this chance and jumped the gun in dismissing these claims under Rule 12(b)(6). Thus, even in the face of the tenuity of these claims, reversal is appropriate.
 
 
 
 [1]
 Upon agreement of counsel for all parties, these three cases were consolidated for purposes of oral argument and rendering of the Court's opinion
 
 
 [2]
 DME consists of wheelchairs, hospital beds, walkers, crutches, and other equipment often used by persons convalescing at home after hospitalization
 
 
 [3]
 The appellant also sued Health East, Inc., the manager of Giles Memorial, in Docket No. 89-2377. The contracts referred to were originally entered into with Primedica, Inc., which was the corporate predecessor to Medserv Corporation. For simplicity, this opinion refers to the company as it existed under both names as "Medserv."
 
 
 [4]
 Radford is a wholly owned subsidiary of Southwest Virginia Health Services Corporation. Southwest Virginia Health Enterprises, Inc., is also a wholly owned subsidiary of that holding company. Southwest Virginia Pharmacy & Medical Supply Company d/b/a Community Pharmacy & Medical Supply is a wholly owned subsidiary of Southwest Virginia Health Enterprises, Inc. For simplicity, this opinion uses the term "Southwest" to refer to this entire family of companies, except for Radford Community Hospital, which is referred to as "Radford."
 
 
 [5]
 Most of the district court's opinion focused on the plaintiff's Sec. 2 claims. The court reasoned that the plaintiff's claims under Sec. 1 of the Sherman Act were also deficient because "those things which are condemned by Sec. 2 are in large measure merely the end products of conduct which violates Sec. 1." Joint Appendix at 21 (citing United States v. Griffith, 334 U.S. 100, 106, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948))
 
 
 [6]
 In the cases involving Twin County and Giles, the Court accepts as true the allegations of the plaintiff's proposed second amended complaints for purposes of this opinion. If those allegations state claims upon which relief could be granted, the amendment of the complaints would not have been "futile" and should have been allowed by the district court. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Island Creek Coal Co. v. Lake Shore, Inc., 832 F.2d 274, 279 (4th Cir.1987). As to the appellant's Sec. 3 Clayton Act claims against Twin County and Giles, which were not included in its second amended complaints, the Court accepts the allegations of the plaintiff's first amended complaints as true. See infra note 20 and accompanying text
 
 
 [7]
 In Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent corporation and its wholly owned subsidiary are legally incapable of conspiring in violation of Sec. 1 of the Sherman Act. See infra discussion pp. 145-47. Because joint ventures consist of multiple entities, they are legally capable of violating Sec. 1. See NCAA v. Board of Regents of the Univ. of Okla., 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)
 
 
 [8]
 In reaching our decision on this and the other claims that we remand for further consideration, the Court expresses no opinion as to the ultimate merits of the plaintiff's case. As this Court has stated, a complaint should not be dismissed "merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff colorably states facts which, if proven, would entitle him to relief, the motion to dismiss should not be granted." Adams v. Bain, 697 F.2d 1213, 1216 (4th Cir.1982)
 
 
 [9]
 It is unclear from the complaint among whom AHCS alleges the conspiracy. For purposes of this appeal, we assume that it alleges all of the possible permutations of alliances among the defendant entities named in the complaint
 
 
 [10]
 Section 2 of the Sherman Act provides in part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. Sec. 2
 
 
 [11]
 AHCS makes clear that it is the subsequent conduct of the affiliated corporations, not the act of affiliation itself, that it deems illegal. It has elected not to allege a claim under Sec. 7 of the Clayton Act. Thus, the Court need not address whether Southwest's acquisition of the local drug store was an illegal combination under Sec. 1. AHCS has not alleged that an original anticompetitive purpose is evident from the affiliated corporations' subsequent conduct
 
 
 [12]
 This conclusion has also received scholarly support. Professor Areeda posits that the total unity of the corporate enterprise is equally reflected in both the parent-subsidiary relationship and the relationship between sister corporations. In refusing to make corporate form determinative of liability, and in refusing to treat wholly owned corporations differently from unincorporated divisions, the Copperweld holding, he argues, also denies conspiratorial capacity to sister corporations' dealings with each other. VII P. Areeda, Antitrust Law Sec. 1464f (1986)
 
 
 [13]
 For similar reasons, we affirm the dismissal of AHCS's claim that Southwest conspired to monopolize the DME market in Radford, Virginia, in violation of Sec. 2 of the Sherman Act. See infra discussion p. 150
 
 
 [14]
 A firm, even one with monopoly power, is not guilty of predatory exclusionary conduct when it is simply exploiting the competitive advantages legitimately available to it. See Berkey Photo v. Eastman Kodak, 603 F.2d 263, 276 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)
 
 
 [15]
 It cannot be assumed on a 12(b)(6) motion that the hospitals have not lost profits in their inpatient services as a result of their exclusive DME agreements. It may be that the plaintiff will be able to show that they are currently losing money with the expectation of recouping those losses after driving the other DME suppliers out of the market. Further, the fact that the monopoly profits gained through the exclusive dealing arrangements may have already offset the lost profits in the hospital services market would not conclusively indicate a lack of antitrust violations. These are all factual issues that cannot be resolved at this point. Cf. Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227 (1st Cir.1983) (outlining conditions necessary for successful predatory pricing)
 
 
 [16]
 The appellees may be correct in their assertion that Aspen Skiing only establishes duties to engage in cooperative behavior in very limited circumstances. See Alpert's Newspaper Delivery Inc. v. The New York Times Co., 876 F.2d 266, 272 (2d Cir.1989). Even if Aspen Skiing is so limited, it cannot be determined from the allegations of the plaintiff's complaints that such circumstances were not present in these cases
 
 
 [17]
 Because we address this case at an undeveloped stage, and because we find that the appellant has stated other related Sec. 2 claims that require a remand of this case for further proceedings, we assume that monopoly leveraging is an independent Sec. 2 violation separate from monopolization and attempted monopolization. We reserve definitive resolution of that issue for a case in which the issue is squarely presented. See Catlin, 791 F.2d at 1346; Association for Intercollegiate Athletics for Women v. NCAA, 735 F.2d 577, 586 n. 14 (D.C.Cir.1984)
 
 
 [18]
 See supra discussion pp. 145-47
 
 
 [19]
 Because AHCS did not include an essential facilities claim in its complaint filed in the Radford case, this section of this opinion refers to the Twin County and Giles cases only
 
 
 [20]
 AHCS did not include a Sec. 3 Clayton Act claim in the amended complaints it proposed to file against Twin County and Giles. Nevertheless, the Court considers these claims in its review of the district court's dismissal of and refusal to reconsider dismissal of the first amended complaints in the Twin County and Giles cases. See supra note 6
 
 
 [21]
 Although separate cases, the language setting forth the Clayton Act Sec. 3 claims is identical in all three complaints
 
 
 [22]
 On the face of the complaints, there are no allegations that the discharged patients are the actual buyers of DME and that they entered into exclusive dealing agreements with Medserv and Southwest. Although plaintiff suggests that the alleged monopoly power of the hospitals influences patients' choice of DME, plaintiff specifically refrains from alleging that the defendants have tied access to medical services with DME selection. Accordingly, we do not address that possibility
 
 
 [23]
 In support of this contention, the plaintiff has cited several cases for the proposition that the appropriate hospital personnel can be the de facto economic decision-makers in the purchasing of medical services. See, e.g., Dos Santos v. Columbus-Cuneo-Cabrini Medical Center, 684 F.2d 1346, 1354 (7th Cir.1982); United States v. American Soc'y of Anesthesiologists, 473 F.Supp. 147, 159-60 (S.D.N.Y.1979). But see Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 27-28 & 30 n. 50, 104 S.Ct. 1551, 1566 & 1567 n. 50, 80 L.Ed.2d 2 (1984) (finding it likely that "it is the patient's doctor and not the patient who selects an anesthesiologist," but that this sort of market imperfection was irrelevant); Key Enterprises of Del. v. Venice Hosp., 703 F.Supp. 1513 (M.D. Fla.1989) (rejecting the substitution of hospital discharge personnel for the patient as the consumers of DME). In any event, all of these findings were in the context of defining the relevant market for health-care specialists in Sherman Act cases, and the appellant has not cited any cases that apply this logic to purchaser-identity in exclusive dealing cases
 
 
 [24]
 This theory cannot be maintained in the Radford case because of the extensive corporate relationship in place. See discussion supra p. 152