**M & M MEDICAL SUPPLIES AND SERVICE, INCORPORATED, Plaintiff–Appellant,**

**v.**

**PLEASANT VALLEY HOSPITAL, INCORPORATED; Pleasant Valley Home Medical Equipment, Incorporated, Defendants–Appellees.**

No. 90–3100.

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1992.

Decided Dec. 9, 1992.

As Amended Jan. 20, 1993.

James Allen Burt, Strong & Associates, P.C., Springfield, Mo., argued (Richard A.

Bush, Bush & Trippel, Parkersburg, W.Va., on brief), for plaintiff-appellant.

John Earl Jenkins, Jr., Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, W.Va., argued (Carroll W. Casto, Casto & Casto, L.C., Point Pleasant, W.Va., William G. Kopit, Epstein, Becker & Green, P.C., Washington, D.C., on brief), for defendants-appellees.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG, and WILLIAMS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

BUTZNER, Senior Circuit Judge:

M & M Medical Supplies and Service, Inc. (M & M), a retail dealer in durable medical equipment (DME), appeals a summary judgment dismissing its antitrust action and pendent state claims against Pleasant Valley Hospital, Inc., and its subsidiary, Pleasant Valley Home Medical Equipment, Inc. (Equipment Company). M & M complains that the Hospital uses its access to patients to exclude a previously strong DME competitor from the market. The Hospital contends that M & M did not meet its burden of proving the elements of its claim.

The district court held that M & M failed to furnish sufficient proof to withstand summary judgment with respect to its claim that the Hospital and its Equipment Company monopolized and attempted to monopolize the DME market in Mason County, West Virginia, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Specifically, the court ruled that M & M had failed to establish the relevant market and to show that the Hospital and its Equipment Company had monopoly power or had attempted to monopolize the DME market. The district court also dismissed the claim of monopoly leveraging on the ground that it is not a distinct claim under the Sherman Act. It summarily dismissed pendent state claims. *M & M Medical Supplies & Service, Inc. v. Pleasant Valley Hospital, Inc.*, 738 F.Supp. 1017 (S.D.W.Va.1990).

A panel of this court, one judge dissenting, vacated the summary judgment entered in favor of the Hospital and its Equipment Company. 946 F.2d 886. The court then reheard the appeal en banc. Guided in part by recent decisions that were not available to the district court, we again vacate the district court's judgment and remand the case for further proceedings.

## I

Since approximately 1980, M & M has sold and rented DME to patients receiving medical care and treatment. DME is a category of medical goods that includes beds, wheelchairs, walkers, and oxygen equipment. M & M is located in Point Pleasant, West Virginia, one of four DME dealers in that community. The Hospital is a 128–bed, acute-care hospital also located in Point Pleasant. It is the only acute-care hospital in Mason County and draws approximately 65% of its patients from Mason County. The rest of the patients are drawn largely from Gallia and Meigs Counties, Ohio. Both of these Ohio counties have acute-care hospitals, and some Mason County patients use them.

Late in 1985, the Hospital found itself faced with flagging revenues because of cutbacks ordered in the rates of Medicare and Medicaid reimbursement. In response, the Hospital decided to enter the DME business as a means of bolstering its profitability. The Hospital first attempted to purchase M & M, but the parties could not come to terms. In November 1985, the Hospital opened a wholly owned subsidiary, the Equipment Company. After the founding of the Equipment Company, the gross revenues of M & M fell by more than 75%.

## II

Federal Rule of Civil Procedure 56 requires the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A motion for summary judgment may not be defeated by evidence that is "merely colorable" or "is not sufficiently probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Summary judgment is inappropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (quoting *Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir.1951)). However, respondents must show that the inferences they suggest are "reasonable in light of the competing inferences...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Like any other nonmoving party that will bear the burden of proof at trial, M & M is entitled

> to have the credibility of [its] evidence as forecast assumed, [its] version of all that is in dispute accepted, all internal conflicts in it resolved favorably to [it], the most favorable of possible alternative inferences from it drawn in [its] behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Charbonnages,* 597 F.2d at 414. The appellate standard for review of a summary

judgment is *de novo. Medical Waste Assocs. v. Mayor and City Council of Baltimore,* 966 F.2d 148, 150 (4th Cir.1992).

■ We reject M & M's argument that the district court improperly allocated the burden of production under Fed.R.Civ.P. 56. The rule "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). By requiring M & M to establish that triable issues existed as to every element of its claims, the district court properly applied the doctrine of *Celotex.*

■ M & M also assigns error to the district court's entry of a protective order under Fed.R.Civ.P. 26(c) barring it from contacting former patients of the hospital whose identity it learned through discovery. The district court acted after the Hospital complained that M & M was harassing its former patients.

■ An order under rule 26(c) is committed to the discretion of the trial court and will not be disturbed on appeal unless the court has abused its discretion. *Keyes v. Lenoir Rhyne College,* 552 F.2d 579, 581 (4th Cir.1977). Abuse may be demonstrated by a clear showing that denial of discovery has caused substantial prejudice. *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 744 (7th Cir.1985). Inasmuch as M & M obtained critical evidence from some patients before the ban on discovery, it was not substantially prejudiced. Consequently, at this stage of the proceedings, we find no cause for reversal in the district court's ruling, leaving to the court on remand how to accommodate the interests of the parties and the patients within the dictates of rule 26(c) as circumstances develop.

### III

■ In order to withstand the entry of summary judgment, M & M had to establish that the Hospital and its Equipment

Company possessed monopoly power in the relevant market and that they willfully acquired or maintained "that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). M & M claims the relevant market is Mason County, West Virginia. The Hospital claims that in addition to Mason County the relevant market includes Gallia and Meigs Counties, Ohio, which are linked by bridges spanning the Ohio River.

The district court held that M & M's evidence was insufficient to show the possession of monopoly power in the relevant market. The district court then found no need to address willful acquisition or maintenance of monopoly power. It reached this result by refusing to consider the affidavit of M & M's expert, Dr. Roger D. Blair, because, in the court's view, the affidavit did not set forth specific facts. *See M & M Medical*, 738 F.Supp. at 1020.

In his affidavit, Dr. Blair stated:

For purposes of the affidavit, I have reviewed the Complaint and the material produced by Pleasant Valley Home Medical Equipment identifying the origin of their patients as well as patient origin data for Pleasant Valley Hospital. I have interviewed Michael Marnhout and other M & M Medical Supplies personnel. I have visited Point Pleasant, West Virginia and personally identified all companies relevant to this case. I have made price comparisons for articles of durable medical equipment offered by Pleasant Valley Home Medical Equipment and M & M Supplies and Services.

\* \* \* \* \* \*

The relevant geographic market for hospital services and durable medical equipment in this case is Mason County, West Virginia. The patient origin data strongly suggest that Mason County residents rely predominantly upon Mason County suppliers for their hospital and medical equipment needs. Some overlap into the neighboring Ohio counties is to be expected but does not change the unmistakable conclusion that Mason County represents a distinct geographic market for antitrust analysis.

Pleasant Valley Home Medical Equipment is exercising monopoly power—i.e., the power to raise price or exclude competition. Pleasant Valley Home Medical Equipment has held its prices above those charged by M & M Supplies and Services on numerous articles of DME for over a year without losing significant numbers of customer[s]. This is a direct measure of monopoly power.

Affidavits submitted to support or oppose a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Affidavits submitted in opposition to a motion for summary judgment "made and supported as provided in this rule ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

Dr. Blair's qualifications are not questioned. His affidavit satisfies the rule. He recited his basis for personal knowledge: a review of the data showing the patient origin for the Hospital and the Equipment Company, interviews with M & M personnel, visits to Point Pleasant and identification of the relevant companies, and his price comparisons for DME offered by the Equipment Company and M & M.

Dr. Blair's affidavit was far more than a conclusory statement based on general antitrust theory. He cited the facts that supported his conclusion concerning the relevant market and the exercise of monopoly power. The facts were patient origin and price comparison. His report that the Equipment Company had been holding its prices above M & M's for over a year without losing a significant number of customers was stated as a fact. Based on these facts, Dr. Blair explained his reasoning concerning the relevant market and monopoly power.

What Dr. Blair omitted from his affidavit were not facts or reasons but rather the

underlying data supporting his facts—the addresses of the Hospital patients and the prices of both DME companies. Federal Rule of Civil Procedure 56(e) does not mandate exclusion of an affidavit for lack of the underlying data supporting an affiant's assertion of fact. Instead the rule provides for supplementation of affidavits by depositions, answers to interrogatories, or further affidavits. In this manner underlying data can be obtained if needed for evaluation of the expert's opinion.

■ The district court held that Federal Rule of Evidence 705, which allows an expert to give his opinion without prior disclosure of the underlying facts, does not alter the requirement of Fed.R.Civ.P. 56(e) that affidavits submitted in summary judgment proceedings set forth specific facts.

■ The district court's observation is correct. An expert's affidavit that is wholly conclusory and devoid of reasoning does not comply with Fed.R.Civ.P. 56(e). *Military Services Realty, Inc. v. Realty Consultants of Virginia, Ltd.*, 823 F.2d 829, 832 (4th Cir.1987). The deficiencies in such an affidavit are not remedied by resort to the Federal Rules of Evidence. *See Mid–State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.1989); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985); *United States v. Various Slot Machines*, 658 F.2d 697, 699–701 (9th Cir.1981); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672–73 (D.C.Cir.1977).

But the primacy of Fed.R.Civ.P. 56(e) does not exclude all applications of the Federal Rules of Evidence pertaining to an expert's opinion in summary judgment proceedings. In view of Fed.R.Evid. 1101(b), which makes the Federal Rules of Evidence apply generally to all civil actions, Fed.R.Evid. 705 and Fed.R.Civ.P. 56(e) must be reconciled. Federal Rule of Evidence 705 permits an expert to give reasons for an opinion "without prior disclosure of the underlying facts or data unless the court requires otherwise." As previously noted, we believe that Fed.R.Civ.P. 56(e) trumps this rule of evidence with respect to the disclosure of facts in a summary judgment

proceeding. Nevertheless, Fed.R.Civ.P. 56(e) and Fed.R.Evid. 705 can be reconciled with respect to data supporting the facts. Neither rule requires prior disclosure of the supporting data—in this case patients' addresses and DME prices. Furthermore, both rules contemplate supplementation of the expert's affidavit to disclose supporting data if the court deems the disclosure to be necessary before it decides the motion for summary judgment.

In cases comparable to the one before us, appellate courts have reversed summary judgments that were based on the exclusion of experts' affidavits because of the mistaken belief that they failed to contain specific facts. In *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316–18 (9th Cir. 1985), the court drew a distinction between a wholly conclusory affidavit and an affidavit stating facts but lacking detail. Adverting to the proper accommodation between Fed.R.Civ.P. 56(e) and Fed.R.Evid. 705, the court held that if further information was necessary the district court should require it to be disclosed instead of excluding the affidavit. To the same effect is *Monks v. General Electric Co.*, 919 F.2d 1189, 1192 (6th Cir.1990), in which the court in dicta referred to Fed.R.Evid. 705 to preserve an affidavit that the district court believed to be deficient because it lacked extensive detail. The court in *Ambrosini v. Laborraque*, 966 F.2d 1464, 1470–71 (D.C.Cir.1992), reversed a grant of summary judgment because the district court erred in holding an expert's affidavit to be deficient. The court of appeals noted that the affidavit stated a fact as the basis of the expert's opinion. While recognizing the distinction between Fed.R.Civ.P. 56(e) and Fed.R.Evid. 705, it concluded that without further inquiry into the factual basis of the opinion, summary judgment was premature.

We reject M & M's argument that Fed.R.Evid. 705 permits deferral of disclosure of Dr. Blair's data until trial. Neither Fed.R.Civ.P. 56(e) nor Fed.R.Evid. 705 places any limitation on a court's authority to require an expert to disclose supporting

data in any pretrial proceeding, including one for summary judgment.

In sum, we reiterate that an expert's conclusory affidavit lacking facts does not satisfy the requirements of Fed. R.Civ.P. 56(e). In contrast, an affidavit that states facts on which the expert bases an opinion satisfies Fed.R.Civ.P. 56(e) even though the expert does not attach the data supporting the facts. If need be, the court, acting pursuant to Fed.R.Civ.P. 56(e) and Fed.R.Evid. 705, can require the expert to furnish the supporting data. Applying these precepts, we conclude that the district court should not have granted summary judgment dismissing the monopoly claim on the ground that Dr. Blair's affidavit was inadequate.

## IV

M & M's attempted monopolization claim is based on section 2 of the Sherman Act which forbids an attempt to monopolize as well as monopolization. An attempt to monopolize employs "methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); *see also Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905) (the seminal case). Courts analyze this offense as having three elements: (1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 926 (4th Cir.1990); *Advanced Health–Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139, 147 (4th Cir.1990).

Specific intent may be inferred from the defendant's anticompetitive practices. *See Abcor*, 916 F.2d at 927; *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 802 (8th Cir.1987); *see also* 2 Earl W. Kintner, *Federal Antitrust Law* § 11.9, at 318 & nn. 189–90 (1980). It is therefore logical to begin by analyzing the

record to see whether it establishes anticompetitive acts by the defendant. The district court held that M & M's proof was insufficient because "the evidence of record does not indicate that the patients were coerced or forced in any way to satisfy their DME needs through the Equipment Company to the exclusion of all of its competitors" and "[t]here is nothing [in the record] to suggest that the patients were threatened or would have been subject to adverse action if they had chosen another DME supplier." *M & M Medical*, 738 F.Supp. at 1021.

The district court's formulation misstates the standard for anticompetitive conduct. "If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S.Ct. 2847, 2859, 86 L.Ed.2d 467 (1985) (quoting Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 138 (1978)). "Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Aspen Skiing*, 472 U.S. at 603, 105 S.Ct. at 2857 (quoting Bork, *The Antitrust Paradox* 160).

In a case that also charges hospital-DME monopolization, we held recently that

> if the plaintiff can prove that the DME now provided to patients in the relevant areas is inferior in quality and/or more expensive than [the plaintiff's], it will have shown harm to competitors, short-term sacrifices by the hospitals, and adverse effects on merits competition that injure DME consumers, all as a result of the hospitals' entry into the DME markets. From this a finder of fact may be able to infer that their motives were anticompetitive (i.e., that there were predatory acts stemming from an illegal specific intent to monopolize).

*Advanced Health–Care*, 910 F.2d at 148. In that case, we applied *Aspen Skiing* to the alleged exclusionary conduct of a hospital and its favored DME supplier and held that the conduct supported an inference that the hospital deliberately discouraged

its customers from dealing with DME dealers other than the one affiliated with the hospital. The allegations supporting this inference, we held, stated a claim for attempted monopolization. *Advanced Health–Care*, 910 F.2d at 149 (citing *Aspen Skiing*, 472 U.S. at 610, 105 S.Ct. at 2861).

Viewed in the proper light for summary judgment, this record discloses in affidavits made by former patients and staff that after the founding of the Equipment Company, a memorandum had been sent to physicians practicing at the Hospital suggesting that they refer all their patients to the Equipment Company for their DME needs. A medical staff assistant to one physician confronted a Hospital official about the memo and about patients' complaints about the Hospital's DME referral policy. The official at first denied, then confirmed, the existence of the memo and threatened the staff member with legal action because of her complaint. Hospital employees told a patient's granddaughter who wished to order a bed from M & M that only the Equipment Company could supply the proper equipment for her grandfather. One former Hospital physician was pressured by the Hospital to cease her practice of referring patients to an outside company as a rental source for in-hospital infant monitors that would later be taken home with babies requiring monitoring. When she continued to make such referrals, the Hospital changed its regulations to forbid in-hospital use of infant monitors supplied by vendors other than the Hospital's Equipment Company. One former Hospital employee whose husband rented DME from M & M for his own medical needs received a mailed solicitation to switch to the Equipment Company and a visit from a Hospital worker who told her that she should switch companies because she was a Hospital employee. This employee reported that "We found [M & M's] service to be excellent. I felt it unfair that the hospital would use my husband's medical records to obtain information to get business. I also feel it was unfair to have been placed in the position to change my husband to the Hospital's equipment company, because I was an employee."

Perhaps most significant are five affidavits which state that the Hospital ordered DME from the Equipment Company without consulting the patients or telling them they had a choice of DME supplier. In one instance, the Equipment Company delivered oxygen equipment to the patient's home, although the Hospital had made no mention of the need for the equipment, let alone alternative suppliers. More frequently the Hospital employees or staff simply informed the patient that they would provide needed DME without mentioning that they would order it only from the Equipment Company or that alternative suppliers were available. Some of the patients stated in their affidavits that had they been given a choice, they would have purchased the DME from M & M.

This evidence, like that in *Aspen Skiing*, "supports an inference that [the defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Aspen Skiing*, 472 U.S. at 610–11, 105 S.Ct. at 2861.

The Hospital protests that *Aspen Skiing* is inapplicable because in that case the defendant's conduct harmed it as well as the plaintiff. This self-induced injury, the Hospital argues, was critical to the Court's decision because it was proof of "a deliberate effort to discourage its customers from doing business with its smaller rival." *Aspen Skiing*, 472 U.S. at 610, 105 S.Ct. at 2861.

The record in this case discloses self-induced injury on the part of the Hospital and its Equipment Company no less significant for summary judgment purposes than that in *Aspen Skiing*. When the Equipment Company commenced business, it deliberately set DME prices below those of its competing suppliers. While the Equipment Company sought to justify the initial low prices, familiar rules governing summary judgment proceedings entitle M & M, the nonmoving party, to the inference that this was an anticompetitive step toward attempted monopoly.

The record discloses that the Equipment Company took a second anticompetitive step. In due course it charged more than M & M for many items of DME. Nevertheless, it did not lose significant numbers of customers. Such anticompetitive pricing could be maintained, it may be inferred, by the Hospital's practice of ordering DME from the Equipment Company without consulting with its patients.

At this stage of the proceedings, it is fair to infer that the Hospital's restrictive DME practices enabled the Equipment Company to retain customers despite the higher prices it charged after its initial low pricing policy. M & M, responding to a motion for summary judgment, is entitled to the inference that the scheme, as depicted in affidavits before the district court, was an anticompetitive one, manifesting an attempt by the Hospital and its Equipment Company to monopolize the DME market. *See* 2 Earl W. Kintner, *Federal Antitrust Law* § 12.9, at 359–60 (1980).

■■■ The third element of attempted monopolization, a dangerous probability of success, must be shown to be substantial and real. Market share is relevant, but its relevance is tempered by evidence of the other two elements of the claim. Compelling evidence of an intent to monopolize or of anticompetitive conduct reduces the level of market share that need be shown. Conversely, weak evidence of the other two elements requires a showing of significant market share. A rising share may show more probability of success than a falling share. Other factors must be considered, such as ease of entry, which heralds slight chance of success, or exclusionary conduct without the justification of efficiency, which enhances the likelihood of success. *See generally* 3 Philip Areeda & Donald F. Turner, *Antitrust Law* ¶ 835, at 346–48 (1978) (Areeda & Turner). For example, in *White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Cir.1974), a stable nine percent market share with no conduct to enlarge the share showed no dangerous probability of achieving monopoly power. In contrast, allegation of a dominant market share coupled with exclusionary conduct withstood a motion to dismiss for failure to state a claim. *See Advanced Health–Care*, 910 F.2d at 147–49.

In this case the Hospital and the Equipment Company presented evidence that sharply contested M & M's claim of attempted monopolization. Consequently, the showing of market share that M & M will need to establish depends in part on its proof of the other two elements. While the market share necessary to show an attempt to monopolize is difficult to quantify, a leading text has offered a general scale that a court may cautiously apply taking into consideration the proof offered for the other two elements: (1) claims of less than 30% market shares should presumptively be rejected; (2) claims involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious, but not so much so as to make the defendant per se liable; (3) claims involving greater than 50% share should be treated as attempts at monopolization when the other elements for attempted monopolization are also satisfied. *See* 3 Areeda & Turner ¶ 835c, at 350.

Applying these principles, we conclude that patient's descriptions of exclusionary anticompetitive conduct, the affidavits of a doctor and of a former employee recounting pressures applied by the Hospital, M & M's substantial decrease in revenue, and Dr. Blair's affidavit adequately address the three elements of attempted monopolization. M & M's proof discloses genuine issues of material fact sufficient to withstand the motion for summary judgment.

## V

M & M also alleged a violation of the Sherman Act by "monopoly leveraging"— " 'the use of [monopoly] power [in one market], however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor' in another distinct market." *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 (2d Cir.1985) (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir.1979)). The district court

held that this claim was not cognizable under the Sherman Act. *M & M Medical,* 738 F.Supp. at 1021.

In *Advanced Health–Care,* 910 F.2d at 149–50 & n. 17, we reversed the dismissal of a leveraging claim, while expressly reserving judgment until the advent of "a case in which the issue is squarely presented." Again, we express no opinion on this question but assume for purposes of remand that monopoly leveraging is a separate violation of section 2. There will be time enough to evaluate the validity of this assumption after the parties have developed a factual record.

## VI

Because the district court improperly excluded M & M's expert's affidavit in consideration of its monopolization and attempted monopolization claims, and because it decided the specific intent and predatory conduct issues under an erroneous legal standard, we vacate the grant of summary judgment as to those counts. Inasmuch as the law in this circuit does not clearly establish whether monopoly leveraging is a cognizable claim under § 2, we vacate the grant of summary judgment on that count as well. The reinstatement of the § 2 claims restores federal jurisdiction; for this reason, we vacate the dismissal of M & M's pendent state-law claims. The case is remanded to the district court for further proceedings consistent with this opinion.

VACATED AND REMANDED.

K.K. HALL, Circuit Judge, dissenting:

Because I continue to believe that M & M Medical Supplies has failed to carry its burden in opposition to the hospital's motion for summary judgment, I respectfully dissent.

The first element of a claim of monopolization under § 2 of the Sherman Act is "market power." In order to prove the exercise of market power, a plaintiff must show (1) the existence of some specific, defined geographic market for the product, i.e., the "relevant market," and (2) the exercise of monopoly power by the defendants in that market. *Satellite Television & As-*

*sociates Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 714 F.2d 351 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984). If the plaintiff fails to prove either of the elements of market power, its entire claim must be dismissed. *Consul, Ltd. v. Transco Energy Co.,* 805 F.2d 490, 495–96 (4th Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987); *Satellite Television,* 714 F.2d at 357.

In opposition to the motion for summary judgment, M & M submitted an affidavit by Dr. Blair alleging that, based upon his personal investigation and review of the materials produced by Pleasant Valley, the relevant geographic market for durable medical equipment is Mason County, West Virginia. Although Dr. Blair's affidavit recites the materials he reviewed to reach this conclusion, it fails to cite any of the specific facts that he believes demonstrate that Mason County is the relevant geographic market for durable medical equipment.

As the majority states, several cases have recently held that the proper remedy for an expert's affidavit that fails to disclose the facts supporting its conclusion is supplementation rather than exclusion. *See Ambrosini v. Labarraque,* 966 F.2d 1464 (D.C.Cir.1992); *Monks v. General Elec. Co.,* 919 F.2d 1189 (6th Cir.1990); *Bulthuis v. Rexall Corp.,* 789 F.2d 1315 (9th Cir.1985). However, I believe that we should adopt the rule of the Eleventh Circuit: An expert's affidavit submitted in opposition to a motion for summary judgment must set forth specific facts to support its conclusions. *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985); *see also Slaughter v. Southern Talc Co.,* 919 F.2d 304, 307 n. 4 (5th Cir.1990). Therefore, I believe that the district court properly refused to consider a conclusory affidavit that furnished no specific facts in opposition to Pleasant Valley's motion for summary judgment.

Even if I were to find that the district court erred in excluding Dr. Blair's affidavit, I would still hold that M & M failed to

define the relevant market. The relevant geographic market is the area in which the suppliers of *durable medical equipment* effectively compete and to which their customers could practicably turn for alternative sources of such products. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 331–32, 81 S.Ct. 623, 630, 5 L.Ed.2d 580 (1961); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1490 (9th Cir.1991). Dr. Blair clearly failed to differentiate the market for hospital services, which is not at issue, from the market for durable medical equipment. For example, Dr. Blair reviewed "the patient origin data for Pleasant Valley Hospital" and determined:

> The relevant geographic market for hospital services and durable medical equipment in this case is Mason County, West Virginia. The patient origin data strongly suggest that Mason County residents rely predominantly upon Mason County suppliers for their hospital and medical equipment needs....

See *supra* at pp. 163–64. If M & M had chosen to assert a "tie-in" claim, i.e., that Pleasant Valley Hospital was using its hospital services market share to force its customers to purchase durable medical equipment from Pleasant Valley Home Medical Equipment, the patient origin data for hospital services would be relevant. However, M & M has not asserted a tie-in claim and, therefore, it was wrong for Dr. Blair to rely upon the patient origin data for hospital services in order to determine the geographic market for durable medical equipment.

Assuming, for the purposes of summary judgment, that Dr. Blair relied solely upon the patient origin data from Pleasant Valley Home Medical Equipment in order to determine the relevant market for durable medical equipment, I would still be troubled. Dr. Blair's affidavit assumes, without offering any evidence to support his assumption, that the relevant market for durable medical equipment may be defined by the residences of the customers of Pleasant Valley Home Medical Equipment. Of course, the area in which a market participant operates does not define the

market itself. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d at 1490 ("[A] company may compete in many markets or in only part of a market. Where it competes does not define the market.").

Finally, although Dr. Blair concedes that the market for durable medical equipment overlaps into the neighboring Ohio counties, he offers no facts to demonstrate how much overlap exists (in absolute or relative terms). For example, 35% of Pleasant Valley Hospital's customers are not from Mason County. Assuming *arguendo* that the market for hospital services may be used to define the market for durable medical equipment, Dr. Blair does not even address why this substantial overlap into neighboring counties does not destroy his theory that Mason County alone is the relevant market.

In short, the plaintiff failed to show the existence of a specific, defined geographic market and, therefore, summary judgment was properly entered against M & M.

M & M's claim for attempted monopolization also requires that it establish the relevant geographic market that Pleasant Valley is allegedly attempting to monopolize. Because M & M has failed to establish the relevant market this claim also must fail.

I would affirm the district court's grant of summary judgment. I am authorized to state that Circuit Judge DONALD RUSSELL, Circuit Judge WIDENER, Circuit Judge WILKINSON, and Circuit Judge NIEMEYER join in this opinion.

LUTTIG, Circuit Judge, dissenting:

I believe that the district court properly granted summary judgment on M & M's monopolization and attempted monopolization claims under section 2 of the Sherman Act, and accordingly I dissent. I would hold, even if M & M's expert affidavit established a genuine issue of material fact as to the Hospital's monopoly power in the relevant market, that M & M failed to produce evidence that Pleasant Valley Hospital or its subsidiary, Pleasant Valley Home Medical Equipment, willfully ac-

quired or maintained monopoly power, evidence that is essential to M & M's monopolization claim. I would also hold, as did the district court, that M & M failed to produce evidence of a specific intent by Pleasant Valley to monopolize, evidence that is essential to its attempted monopolization claim.

## I.

A section 2 claim for monopolization requires proof of "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *accord, e.g., Eastman Kodak Co. v. Image Technical Servs., Inc.*, — U.S. —, —, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985). If " 'valid business reasons' " exist for a company's actions, the company cannot be liable for the willful acquisition or maintenance of monopoly power. *Kodak*, — U.S. at —, 112 S.Ct. at 2091 (quoting *Aspen Skiing*, 472 U.S. at 605, 105 S.Ct. at 2858). In fact, this court has held that "[t]o satisfy the ... element [of] willful acquisition or maintenance of [monopoly] power," a monopolization plaintiff "must show that a jury could find no valid business reason or concern for efficiency" in the defendant's conduct. *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 105 (4th Cir.1987) (Butzner, J.); *accord Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 710 (4th Cir.1991) (*en banc*).

In my view, M & M did not proffer sufficient evidence on the Hospital's alleged willful acquisition or maintenance of monopoly power to entitle it to proceed to trial on its monopolization claim.[1] M & M's proffer shows that the Hospital referred patients with DME needs to Pleasant Valley Home Medical Equipment [the Equipment Company] instead of to third-party DME providers and that it did not, as a matter of course, inform patients of the existence of third-party DME providers. As the district court noted, M & M proffered neither evidence that "patients were advised they could not go elsewhere for DME" nor any evidence of "coercion." 738 F.Supp. at 1021–22. Nor is there any evidence that the Equipment Company's competitors were foreclosed from soliciting purchases from the Hospital's patients. The referral of patients to the Equipment Company without mention of its competitors is entirely lawful, nonpredatory activity which served the Hospital's valid business interest in supporting its subsidiary rather than its subsidiary's competitors. The Hospital was not obliged under the antitrust laws either to refer its patients to competitors or to inform its patients about third-party DME providers. *See, e.g., Aspen Skiing*, 472 U.S. at 600, 105 S.Ct. at 2856 ("[E]ven a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor."); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 281–84 (2d Cir. 1979).

M & M failed to produce any other evidence inconsistent with the conduct of lawful competitive market activity. While a Hospital nurse encouraged one employee to have her husband switch his DME provider from M & M to the Equipment Company, M & M failed to show that the nurse was forced to suggest this change; indeed, M &

---

1. The majority does not address whether M & M proffered sufficient evidence to withstand summary judgment on its monopolization claim; it holds only that the district court erred in granting summary judgment on the particular ground that Dr. Blair's affidavit was insufficient to support a conclusion that the Hospital possessed monopoly power in the relevant durable medical equipment [DME] market. The district court also did not consider whether Pleasant Valley had willfully acquired or maintained monopoly power, *see M & M Medical Supplies & Serv. v. Pleasant Valley Hosp., Inc.*, 738 F.Supp. 1017, 1020 (S.D.W.Va.1990). We may affirm summary judgment, however, on any ground apparent from the record, even if the basis chosen by the district court proves erroneous. *See, e.g., Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 685 & n. 10 (4th Cir.1992); *cf. Frey & Son, Inc. v. Cudahy Packing Co.*, 256 U.S. 208, 210–11, 41 S.Ct. 451, 451–52, 65 L.Ed. 892 (1921).

M did not show that the overture was prompted by the Hospital or even that the Hospital knew of its occurrence. Nor did M & M show that the employee was threatened with adverse job consequences if her husband refused to switch providers. *See* J.A. at 137–38. Although the Hospital suggested to its staff physicians that they refer their patients to the Equipment Company for DME, M & M did not proffer evidence that the staff was required to do so. And, finally, although M & M proffered evidence that the Hospital required that the few infant monitors used in the Hospital be supplied by the Equipment Company, it adduced no evidence that the Hospital forbad its patients' use of other monitors outside the Hospital, or that it required that any other DME used in the Hospital be supplied by the Equipment Company. From the evidence put forward by M & M, it just cannot reasonably be inferred that the Hospital used monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948).

Neither *Advanced Health–Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139 (4th Cir.1990), nor *Key Enters. of Del., Inc. v. Venice Hosp.*, 919 F.2d 1550 (11th Cir.1990), suggests otherwise. In both *Advanced Health–Care* and *Key Enterprises*, hospitals either explicitly tied DME sales to the provision of hospital services, entered into exclusive dealing agreements with specific DME providers, and/or took other affirmative steps to prevent DME sales to their patients by vendors not affiliated with those hospitals. *See Key Enterprises*, 919 F.2d at 1558 (antitrust liability predicated on a "hospital's refusal to allow other DME vendors access" to patients);[2] *Advanced Health–Care*, 910 F.2d at 148–49 (hospitals alleged to "have linked the purchase of DME to the provision of their hospital services" and engaged in "the purposeful exclusion of [a] competitor from gaining access to ... patients" through exclusive dealing agree-

ments). M & M proffers no evidence that Pleasant Valley Hospital conditioned the provision of medical services upon patients' ordering their DME from the Equipment Company, that it entered into an exclusive dealing agreement with the Equipment Company, that it attempted to deny third-party vendors access to the Hospital's patients, or that it engaged in any other activity of restricting patient choice in DME purchases or foreclosing competition by its competitors.

Where challenged business activity is consistent with legal competition, courts will not presume an antitrust violation absent "evidence that tends to exclude" the possibility of legitimate conduct. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). M & M's proffer is devoid of any such evidence. Accordingly, summary judgment was warranted. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

II.

I would also affirm summary judgment in favor of Pleasant Valley on M & M's attempted monopolization claim, because I believe the district court correctly concluded that there was "insufficient evidence of specific intent to monopolize on the part of [the Pleasant Valley companies]," 738 F.Supp. at 1021. A section 2 claim for attempted monopolization must satisfy an even more exacting standard than must a monopolization claim. *See Aspen Skiing*, 472 U.S. at 602–03, 105 S.Ct. at 2857. It requires, *inter alia*, proof that the defendant formed a specific intent to monopolize a market. *See, e.g., id.; Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 926–27 (4th Cir.1990). Mere proof of an intent to do the act is insufficient, *see United States v. Aluminum Co. of Am. (Alcoa)*, 148 F.2d 416, 432 (2d Cir.1945); "a specific intent to

**2.** *Key Enterprises,* in any event, was recently vacated by the Eleventh Circuit and rehearing

*en banc* was granted. *Key Enters. of Del., Inc. v. Venice Hosp.,* 979 F.2d 806 (11th Cir.1992).

destroy competition or build monopoly" is necessary, *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953).

The majority holds that a specific intent by the Hospital to monopolize may be inferred from evidence of what it characterizes as the Hospital's "anticompetitive" practices. *See ante* at 167–68. Most disturbingly, the court identifies as an "anticompetitive" practice the fact that "[w]hen the Equipment Company commenced business, it deliberately set DME prices below those of its competing suppliers." *Id.* at 167. The court reasons that M & M was "entitled" to the inference that *"this* [sale of its products at a price lower than its competitors] was an anticompetitive step toward attempted monopoly." *Id.* (emphasis added). The obvious effect of this novel holding, for which the majority offers no support, is that an antitrust plaintiff can avoid summary judgment on an attempted monopolization claim merely by proffering evidence that the defendant set its prices below those of its competitors.[3]

The majority asserts in explanation that the revenues the Equipment Company lost by setting its prices below those of its competitors constitute "self-induced injury ... no less significant for summary judgment purposes than that in *Aspen Skiing.*" *Id.* This assertion is flawed in two respects. First, it proceeds from the premise—unsupported by the evidence—that the Equipment Company was injured at all by setting its prices below those of its competitors. Insofar as the record discloses, the Company, as a new market entrant, had to offer its equipment at prices below those of its more established competitors (like M & M) to attract customers. In other words, there is no evidence that the Equipment Company *lost* profits by setting its prices below those of its competitors; it may well have *gained* profits from sales that it otherwise would not have been able to make, due to its recent entry into the market. The burden is upon the plaintiff in a summary judgment context to proffer evidence

from which it can reasonably be inferred that a loss occurred.

Second, the majority's assertion ascribes to the term "self-induced injury" a meaning never contemplated by the Supreme Court in *Aspen Skiing.* Standing alone, the "potential loss" represented by the setting of prices above cost but below those of competitors has never been considered self-induced injury of the type that can give rise to a section 2 violation, especially where, as here, a new competitor is attempting to enter and compete in an established market. This is "the very essence of competition." *Matsushita,* 475 U.S. at 594, 106 S.Ct. at 1360; *accord Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338, 110 S.Ct. 1884, 1891, 109 L.Ed.2d 333 (1990); *see also United States Steel Corp. v. Fortner Enters., Inc.,* 429 U.S. 610, 612 n. 1, 97 S.Ct. 861, 863 n. 1, 51 L.Ed.2d 80 (1977) ("No inference of intent to monopolize can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of increasing sales."). Any other conclusion would effectively insulate established firms like M & M from competitive pressures and guarantee their profits, contrary to the purposes of the antitrust laws. As the Supreme Court has observed: "To hold that the antitrust laws protect competitors from the loss of profits due to ... price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result." *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 116, 107 S.Ct. 484, 492, 93 L.Ed.2d 427 (1986); *see also USA Petroleum,* 495 U.S. at 337, 110 S.Ct. at 1891 ("When a firm ... lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anti-competitive' consequence of the claimed violation."); *Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 375 (7th Cir.1986) (even a firm with lawful monopoly power has "no general duty to help its competitors, wheth-

---

**3.** There is no evidence in this case that the Equipment Company engaged in predatory pricing (*i.e.,* pricing below cost) in order to force

competitors out of the market. *See Matsushita,* 475 U.S. at 584 n. 8, 106 S.Ct. at 1355 n. 8.

er by holding a price umbrella over their heads or by otherwise pulling its competitive punches").

The contrast between this type of conduct and the self-induced injury held sufficient in *Aspen Skiing* is readily apparent. In *Aspen Skiing*, the plaintiff Highlands, which owned one of Aspen, Colorado's four major ski areas, previously had engaged in a joint marketing effort with the defendant, Ski Co., which owned the other three areas. Under this plan, the two companies sold multi-day, multi-area passes which allowed purchasers to frequent any of the four areas on a given day. 472 U.S. at 589–93, 105 S.Ct. at 2850–52. Ski Co. withdrew from the plan and offered multi-day, multi-area passes to its three areas alone. Highlands, eliminated from the multi-area pass market, first attempted to purchase Ski Co. lift tickets in bulk, and later set up a guaranteed voucher system for the purchase of such lift tickets, in an attempt to recreate the four-area pass by coupling Highlands passes with vouchers that would allow skiing at the Ski Co. areas.

Ski Co. declined to sell lift tickets to Highlands and refused to accept the vouchers, thereby intentionally forgoing the revenues that would be earned from the additional pass sales. *Id.* at 593–95, 105 S.Ct. at 2852–53. The Supreme Court held that Ski Co.'s decision "to forgo these short run benefits," coupled with the fact that Ski Co. possessed monopoly power, permitted an inference that the defendant intended to force its competitor out of business even at the expense of its own short-term profits. *Id.* at 608, 105 S.Ct. at 2860.

Unlike the defendant in *Aspen Skiing*, there is no evidence that the Pleasant Valley companies ever forwent revenue or other benefits for *any* reason, much less for the purpose of harming their competitors. The only reasonable inference from the record is that the Equipment Company was doing all within its power to increase its sales and profits by reducing its prices so as to compete with its more established competitors.

The court also identifies as an anticompetitive practice the fact that the Equipment Company eventually raised its DME prices above those of M & M. The court characterizes the Equipment Company's pricing above its competitors as "anticompetitive pricing." *Ante* at 168.[4] The mere pricing of a product above the price of a competitor's product is not itself anticompetitive. The higher priced product may in fact be superior in quality and thus deserving of the higher price. If the product is not superior, then consumers will refuse to purchase the product—precisely the response sought in a system of competition.

Presumably the court does not mean to hold (although it does) that pricing above a competitor is itself an antitrust violation, but rather that such pricing and the ability to maintain such prices without losing sales may be evidence of an anticompetitive practice. There is in this record, however, no evidence of other anticompetitive practices. The court lists as anticompetitive practices the Hospital's referral of its patients to the Equipment Company, the Hospital's failure to inform its patients about its competitors, and the Hospital's suggestion to its physicians that they refer patients to the Equipment Company. The court, however, offers no authority for its suggestion that the antitrust laws require that a market participant refer customers to its competitors or inform them of their competitors' existence. Nor does it cite any authority for the assertion that it is anticompetitive for a company to promote its subsidiary's products through its own employees.[5] As noted *supra* at 171–72, I do not believe that any of this evidence can be "fairly characterized as 'exclusionary' or 'anticompetitive' ... or 'predatory'," *Aspen Skiing*, 472 U.S. at 602, 105 S.Ct. at 2857; it is, in my view, all consistent with wholly legitimate business practice.

---

**4.** It is significant that the court therefore holds today that it is an anticompetitive practice to sell both at prices *below* and *above* the competition. The only way to avoid antitrust liability, according to the majority, is to fix prices at the levels maintained by the competition, a practice that is itself suspect under the Sherman Act.

**5.** The court relies generally upon *Advanced Health–Care* as support for its holding. *See ante* at 166–67. For the reasons stated *supra* at 172, this case is easily distinguished from the case *sub judice.*

In short, M & M has not shown through direct evidence that the defendants had a specific intent to monopolize; nor has it proffered evidence of anticompetitive practices from which a specific intent to monopolize may be inferred.[6] "[T]he record reveals no more than vigorous competition" by a new market entrant, *Abcor*, 916 F.2d at 927–28, precisely the kind of conduct that the antitrust laws are intended to encourage.

### III.

Because M & M failed to raise genuine issues of material fact as to essential elements of its monopolization and attempted monopolization claims, I believe the district court properly granted summary judgment in favor of Pleasant Valley on those claims. I therefore respectfully dissent. I am authorized to state that Circuit Judge DONALD RUSSELL and Circuit Judge WILKINSON join this dissenting opinion.

---

**6.** I would also hold that M & M's proffer is insufficient as a matter of law to establish genuine issues of material fact as to the other elements of an attempted monopolization claim— namely, "anticompetitive or predatory conduct" and a "dangerous probability of success." *Abcor*, 916 F.2d at 926; *see also Swift*, 196 U.S. at 396, 25 S.Ct. at 279.